THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LARRY LEVERSTON, Defendant-Appellant.

First District (5th Division)   No. 84—0025

Opinion filed March 29, 1985.

Steven Clark and Barbara Kamm, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, David A. Cuomo, and Joan M. O'Brien, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SULLIVAN delivered the opinion of the court:

Following a jury trial, defendant was convicted of murder, rape, and indecent liberties with a child. The trial court vacated the rape conviction and sentenced defendant to concurrent terms of 50 and 25

years, respectively, on the remaining two convictions. On appeal, he contends that (1) his post-arrest statements should have been suppressed because they were obtained in violation of his sixth amendment right to counsel; (2) he was denied a fair trial by (a) admission of testimony which disclosed, by implication, the substance of privileged communications between him and his attorney, (b) the introduction of highly prejudicial hearsay evidence, and (c) improper prosecutorial remarks in closing argument; and (4) the imposition of extended sentences for both offenses is impermissible.

The charges arose from the strangulation death of 14-year-old Dara Renee Duncan (Duncan) on July 25, 1982. At a pretrial hearing on defendant's motion to suppress certain statements he made, it was stipulated that, pursuant to a warrant issued in Cook County in late July 1982, he was arrested in Beloit, Wisconsin, on August 4, 1982, and that he was represented by local counsel at a hearing in Beloit the following day, at which he voluntarily waived extradition to Chicago.

Officers Duffin and Ptak, Chicago police detectives, testified essentially that on August 5, 1982, they took custody of defendant from the Beloit police and while driving back, when they crossed the State line into Illinois, they advised defendant of his *Miranda* rights, after which he initiated a conversation with them about this case. When they arrived at Area 3 headquarters in Chicago, defendant received *Miranda* warnings again and thereafter answered questions and agreed to give a written statement to an assistant State's Attorney. At no time did he tell them that he had retained—or wanted to see— an attorney, but at about midnight, Cassandra Watson called, identifying herself as his attorney and directing them to cease all questioning until she arrived. Watson spoke to them before conferring with defendant, but never asked whether he had made any statements prior to her arrival. On cross-examination, both officers stated that they had been to defendant's mother's home in Chicago on a number of occasions prior to his arrest in Beloit and acknowledged that they had not sought Watson's permission to ask defendant to sign the consent-to-search form which was presented to him later that day by other officers.

Assistant State's Attorney Pietrucha testified that he arrived at the police station at about 11:15 p.m., advised defendant of his constitutional rights, and had a brief conversation with him which ended when he (Pietrucha) was informed that defendant's attorney was on her way to the station. Then, after consulting with Watson privately for a few hours, defendant gave both a written and an oral statement

in her presence; however, she left at about 5 a.m., before the written version was typed by the court reporter. On cross-examination, Pietrucha stated that he did not advise the officers to present defendant with a consent-to-search form, nor did he instruct them to interrogate him further, although he was notified later that they did.

Detective Boyle testified that later that afternoon, defendant called from police headquarters at 11th and State streets requesting to speak to either Officer Duffin or Ptak regarding a correction he wished to make in his written statement. Since neither officer was available, he (Boyle) drove to the central detention center, where defendant was being held, to speak to him. On cross-examination, Boyle stated that earlier that day Duffin and Ptak had suggested that he attempt to secure defendant's written consent to search his apartment, and that although he knew defendant had retained counsel, he did not call her for permission to talk to him. When he arrived at the men's lockup, he gave defendant the standard *Miranda* warnings before asking him if he would sign the consent form; but defendant asked permission to call his attorney first, and after speaking to her, he refused to do so. Boyle then spoke to Watson, who told him that she did not want defendant to sign the form or to speak further with the police. Boyle acknowledged that while his report noted that he went to central detention to question defendant further, it did not indicate that defendant had telephoned him prior thereto.

Cassandra Watson, an attorney specializing in criminal defense, substantially corroborated the testimony of Duffin, Ptak, and Pietrucha regarding the telephone call she made to the police station and the events occurring there after her arrival, adding that her actions were prompted by a call she received at about 1 a.m. from a member of defendant's family. On cross-examination, Watson stated that she spoke to defendant's mother the previous morning, and when she arrived at defendant's mother's home she told the two plainclothes officers who were there investigating the case that she was defendant's attorney. She further stated that the officers to whom she spoke at the station did not tell her that defendant had previously made an oral statement to them, nor did they ask her permission or express their intention to question him further or to secure his written consent to search his apartment.

Freddie Mae Leverston, defendant's mother, testified that on the evening of August 4, defendant called her from Wisconsin, told her that he had been arrested and charged with murder, and asked her to contact Watson. Later that morning, Watson called inquiring about defendant, and when she told her that two detectives were there ask-

ing questions, Watson advised her not to say anything to them. The trial court denied defendant's motion to suppress, finding that he had been adequately advised of his constitutional rights and had knowingly and voluntarily waived them prior to making any statements.

At trial, Michael Russell testified that as he was walking his dog in the alley near 72nd and Honore streets, at about 11:30 p.m. on July 25, 1982, he discovered the body of a young girl. When Officer Urquoyo arrived at that location, he found the girl lying faceup with her blouse pulled up and her pants unzipped. He saw no blood nor any objects which might have been used as a murder weapon. A deputy medical examiner then testified that the cause of death was strangulation.

Herbert Hicks testified that at about 7 p.m. on the night of the murder, Duncan and another girl—whose name he did not know—approached him as he was sitting on his porch at 68th and Wood streets and asked him to buy them a quart of beer. When he refused, the girls walked across the street and sat down on the porch of a vacant house. A short time later, defendant—whom he knew for about two weeks—came out of his brother's house on the corner and walked toward an old green and white van parked in front thereof. Duncan and her friend approached the van and conversed with defendant for about five minutes. He (Hicks) then went inside, and when he came out about 20 minutes later, the girls, defendant and the van were gone. Hicks identified certain State's exhibits as photographs of the van he saw and stated on cross-examination that it had been parked about 50 feet from his house, but that he did not see anyone get into it nor did he see or hear it being driven away.

Kip Vantrease, a neighborhood resident, testified that on the day in question he saw Duncan and defendant buying beer in the Brown Sugar Liquor Store on 67th and Ashland streets. When they left the store, they walked west on 67th to Wood Street. He knew that defendant had a green and white van, but did not see it on that day.

Karl Lesley, another local resident, testified that when Duncan and defendant came out of the liquor store at about 8:30 p.m., they walked west on 67th Street to Marshfield Avenue and then south to 68th Street, where they entered a green van—which sounded as though it had a bad exhaust system—and drove away. On cross-examination, Lesley stated that the van he saw them enter was solid green, unlike the green and white van pictured in the State's exhibits.

Officer Ptak testified that in the course of their investigation he and Officer Duffin interviewed between 30 and 35 people in the area where Duncan's body was discovered, several of whom said that they

last saw her getting into a green and white van with defendant. They found the van—which was registered to defendant's brother Thomas, who told them that he had loaned it to defendant—on 64th and Wood streets, but were unable to locate defendant. On August 4, 1982, they went to the home of Edmund Williams, who voluntarily accompanied them to the police station and told them that defendant was staying in Beloit, Wisconsin. Ptak reiterated his previous testimony regarding defendant's arrest in and transportation from Beloit, and further testified that at first defendant denied any involvement in the crime, stating that he merely bought some beer for Duncan, after which Williams, whom he referred to as his cousin, took her to his (defendant's) apartment. Later, defendant changed his account of the events, stating that he went back to the apartment and saw Williams kill her by standing on a plunger handle he (Williams) had placed across her throat. He also admitted helping Williams remove Duncan's body from the apartment and dispose of it in an alley. When he told defendant that the girl had been raped and that it could be determined through blood tests whether he had sexual relations with her, defendant admitted that he did so after a discussion between her and Williams about a $15 payment; he stated, however, that he never intended to pay her and that he knew he had "made a mistake" because "she was too young." Defendant's subsequent statements in the car and at the police station were essentially the same. Ptak further testified that they contacted Williams only because they learned he was defendant's friend, not because he was ever a suspect. They checked the alibi he gave them as to his whereabouts on the night of the murder and then drove him home. On cross-examination, Ptak stated that they did not speak to Williams until August 4, and acknowledged that they did not know his whereabouts prior to that date and that he told them he had been to Beloit once in the past. They did not advise Williams of his *Miranda* rights, nor did they fingerprint, photograph, or take nail clippings or a blood sample from him, and they informed the assistant State's Attorney who questioned Williams at the grand jury hearing that he was not under suspicion for this crime.

Edmund Williams testified that he has known defendant all of his life and occasionally spent the night at defendant's apartment although he did not live there. In the afternoon of the murder, he, defendant, Tom (defendant's brother) and Tom's wife were sitting on Tom's porch drinking beer when Duncan approached and began talking to defendant. After a few minutes they walked away together, and about two hours later, he (Williams) went home. He did not see

defendant again until 9:30 that night, when defendant came to his house and asked him to go with him to Tom's house. As they were walking through the park, defendant told him that he had sex with a girl at his apartment and then strangled her until she "passed out." She regained consciousness, however, so he strangled her again, and after she revived a second time he placed the wooden handle of a plunger across her neck and stood on it for about an hour. Defendant also told him that the girl was only 14 years old and that he killed her because she tried to steal his stereo. When he left Tom's house at about 11:30 p.m., defendant was still there, as was Tom's van which, though "broken and noisy," was still driveable. About two weeks later, Officers Duffin and Ptak came to his house to speak to him, but because of the lack of privacy there, he agreed to accompany them to the police station where, over a period of about two hours, he answered questions, furnished them with fingernail samples, and was photographed; Officer Ptak was not present for the latter two procedures. He was not fingerprinted, however, nor did the police give him the *Miranda* warnings. After the interview, the officers drove him home and returned in the morning to drive him to court for his appearance at the grand jury hearing, before which he was advised of his constitutional rights by an assistant State's Attorney. He admitted to a conviction for misdemeanor theft, but denied any involvement in this crime, stating that he was at home with his family between 7 and 9 p.m. and then at Tom's house with Tom and defendant between 9:30 and 11:45 on the night of the murder.

On cross-examination, Williams at first could not remember having spoken to three assistant public defenders about this case in January 1983, but then recalled the meeting and acknowledged telling them that the police intended to arrest him. He denied traveling to Beloit with defendant and his uncle after the murder, stating that he had never been in Beloit and knew where defendant was staying only because he overheard a conversation between defendant and his stepmother concerning an address in that city. Although defendant never threatened him not to tell what he knew, he was "a little afraid" of him.

Officer Duffin testified, over defense counsel's objection on grounds of hearsay and repetition, to substantially the same events as did Ptak regarding their investigation of this case. He also testified that after reading defendant's written statement, they talked to Williams' relatives "to verify his account of where he was relative to the allegations made against him by [defendant]" and that it (Williams' alibi) "checked out." On cross-examination, Duffin stated that he did

not recall Williams telling them that he was at Tom's house on the night of the murder, and acknowledged that Williams was photographed and fingerprinted and that fingernail clippings had been taken to check for skin fragments, but stated that these procedures were not performed because he was a suspect and that nail samples were also taken from Duncan's boyfriend. Duffin also conceded that his report did not indicate that defendant had changed his account of events during the return trip from Beloit and that it was typed from his memory the following day.

Cassandra Watson testified that she withdrew as defendant's attorney the first time this case came up on the trial call, for personal reasons which had nothing to do with the fact that he was charged with murder.

Assistant State's Attorney Pietrucha was recalled at trial to read defendant's written statement in which he acknowledged that he had been advised of his constitutional rights and that, after speaking to his attorney, had signed a written waiver thereof. Defendant then stated that on the day in question, he and Williams were sitting on Tom's porch drinking beer when a girl—with whom he had engaged in sex on two prior occasions after she told him she was 17 years old, but whose name he could not recall—approached and asked for some beer. He identified a photograph of Duncan as the girl to whom he was referring, and stated that since they only had a small amount of beer left, offered to buy more if she would agree to drink it with them. He and Duncan went to a liquor store near 66th and Ashland streets while Williams—who had the keys to his apartment because he had been staying with him for a few weeks—went there to straighten up and light some incense. They arrived at the apartment at about 3 p.m. and sat together in the living room for about one-half hour drinking beer and listening to the radio, but when Williams left the room with a magazine, Duncan began kissing him and thereafter agreed to have sex with him on the couch. When Williams returned and realized what had occurred, he asked her—and she agreed—to have sex with him in the bedroom. About 15 minutes later, he heard bumping noises and heard Duncan ask, "Why are you doing this to me?" Shortly thereafter, Williams emerged from the bedroom, took a telephone cord from the kitchen drawer, and told him that "he would get some." He (defendant) laughed, believing that Williams was "playing" with her, but when he heard more noise, he went into the bedroom and saw Duncan lying on the floor with her hands and feet tied behind her back and the telephone cord wrapped around her neck. Williams told him not to worry, repeating that he "would get his." A lit-

tle later, he heard gurgling noises, and upon entering the bedroom to investigate, he saw Williams standing on a plunger handle placed across Duncan's throat and foam—which he thought was beer—coming out of her mouth. He told Williams to untie her and let her go, but when Williams ordered him out of the room, he left, warning Williams, "Don't get no case in my house." Williams then came out and told him that he thought the girl was dead, but when they discovered a heartbeat, Williams untied her, dragged her to the bathroom, and put her in the tub. It was shortly after 6 p.m. when they checked her again and, hearing no heartbeat, he told Williams to get her out of the apartment, but Williams said he could not do so until after dark. He (defendant) then left for about 15 minutes, after which he returned to the apartment and hollered for Williams from outside the window. Receiving no answer, he walked across the park—about nine blocks—to Williams' house where he found him playing cards with his sister. They returned to the apartment twice more that evening, at about 7 p.m. and then again sometime after 8 o'clock, but he did not go inside on either occasion. The first time Williams came out with a bag containing beer cans, the telephone cord, and a pair of shoes, all of which he threw away as they walked to Tom's house. The second time, Williams came down the back stairs with Duncan's body in an Army sack which he pushed under the back porch. He (defendant) then borrowed his stepfather's car, into which Williams loaded Duncan's body and then drove away. About 10 minutes later, Williams picked him up on a corner and they both returned to Tom's house.

After reading the statement, Pietrucha testified—over objection—that the attorney-client privilege prevents an attorney from revealing what was said to him or her by a client, and the court explained that the purpose of this testimony was to clarify that Watson's appearance as a witness for the State did not mean that she was cooperating with the prosecution.

Gad Fields, defendant's uncle, testified for the defense that the day after the murder, defendant suggested that they drive up to Beloit to fish and visit his (defendant's) half-sister, explaining that he wanted to leave town because he was having some trouble with a gang. At about 10 o'clock that night, he, defendant, Williams, his niece, and two friends drove up to Beloit in his car. Cheron Robinson corroborated Field's testimony, adding that the sister in Beloit was her full sister but only a half-sister to Tom and defendant. Defendant's mother also testified that she was divorced from defendant's father for many years and did not know his second family.

Thomas Leverston testified that Williams was at his house at

about 9 o'clock in the morning and then again between 2 and 4 p.m. on the day of the murder, but did not return thereafter. He (Thomas) owned a green and white van which he sometimes allowed defendant to drive, but on that day it was very noisy and hardly driveable. He knew that his and defendant's father had remarried after the divorce from their mother, but did not maintain contact with that side of the family and knew of no sister who lived in Beloit.

Alfred Ivy testified that sometime in late July or early August 1982, he and Tom went to Williams' house to talk to him about the murder. When he asked Williams if he knew where defendant was staying, Williams said, "They ain't gonna find him." He told Williams that "it would help him a lot more if he would show up," to which Williams replied, "Cuz [referring to defendant] didn't do it. Before I let Cuz take the fall, I will do the time. What's 20 or 30 years." On cross-examination, Ivy stated that he was not a friend of defendant and knew him only through Tom.

OPINION

■■ We first consider defendant's contention that his post-arrest statements should have been suppressed because they were obtained in violation of his sixth amendment right to counsel. Although he does not deny receiving *Miranda* warnings prior to making the first statement during the drive back to Chicago from Beloit, he argues, essentially, that since adversarial judicial proceedings had been initiated against him by the filing of the complaint on the approval of the assistant State's Attorney, his sixth amendment right to counsel had already attached and that the mere recitation of *Miranda* warnings in the car was not sufficient to form the basis for a valid waiver thereof absent evidence that he was informed that charges had been filed and an indictment was being sought against him, that he understood the significance thereof, and that he nevertheless intentionally relinquished his right to counsel. He further argues that the second and third statements were also inadmissible because they were tainted by the illegal procurement of the first. In response, the State argues that at the time of the first statement, defendant's sixth amendment rights had not yet attached and, alternatively, that even assuming *arguendo* they had, defendant knowingly and voluntarily waived them.

Initially, we note, and the parties agree, that the sixth amendment right to counsel (U.S. Const., amend. VI) differs from the right guaranteed by the fifth amendment to have counsel present during custodial interrogation (U.S. Const., amend. V) in that the former is not

activated until adversarial judicial proceedings, which are described as "formal charge, preliminary hearing, indictment, information or arraignment" have been commenced. *Kirby v. Illinois* (1972), 406 U.S. 682, 688-89, 32 L. Ed. 2d 411, 417, 92 S. Ct. 1877, 1881-82; *People v. Martin* (1984), 102 Ill. 2d 412, 466 N.E.2d 228, *cert. denied* (1984), 469 U.S. 935, 83 L. Ed. 2d 270, 105 S. Ct. 334.

The parties also acknowledge that the United States Supreme Court has not resolved the question of whether sixth amendment rights automatically attach upon the filing of a criminal complaint (see *Edwards v. Arizona* (1981), 451 U.S. 477, 480 n.7, 68 L. Ed. 2d 378, 383 n.7, 101 S. Ct. 1880, 1883 n.7), and although the Illinois Supreme Court noted, in *People v. Owens* (1984), 102 Ill. 2d 88, 464 N.E.2d 261, that "there is respectable authority that whether adversarial proceedings commence with the filing of a complaint depends on the degree of prosecutorial involvement" (102 Ill. 2d 88, 101, 464 N.E.2d 261, 266), it too declined to conclusively resolve the issue in that case. However, the *Owens* court did provide considerable guidance on the issue of waiver of the sixth amendment right to counsel, and since the parties both cite *Owens* as support for their respective positions, we believe that a review of that case is necessary here.

Subsequent to his arrest in Kankakee on a warrant issued by the Will County Circuit Court, the defendant in *Owens* was advised of his *Miranda* rights and transported to a Kankakee police station where, on numerous occasions over a period of two days, officers sought to interrogate him. While he declined to answer their questions, at no time did he request an attorney. On the second day, two Joliet police officers whom defendant knew arrived in Kankakee and, according to their testimony, informed defendant that they had a warrant for his arrest for a murder in Joliet. He denied that they so informed him but admitted that he knew he was being held on a homicide charge. It appears that there were also testimonial conflicts as to whether defendant signed the written waiver of his *Miranda* rights before or after interrogation, but the trial court ruled that the waiver was signed prior to questioning. In his subsequent statement, defendant first denied any involvement in the murder. However, after being told by the police that they possessed a tape recording in which he admitted beating and robbing the murder victim and, according to defendant, after the officers also informed him that the victim had died from a heart attack rather than from the beating, he orally confessed to the attack and thereafter twice repeated his confession—once in writing and once on tape. On direct appeal to the supreme court, defendant did not dispute that he was advised of his *Miranda* rights and

had signed a waiver thereof, but contended that the warnings alone were not sufficient to fully inform him of his fifth and sixth amendment rights and that, without knowledge of the significance of the arrest warrant and that a complaint for murder had been filed, he could not validly waive those rights.

The supreme court first stated that the standard rule is that an express, written waiver is persuasive proof of the validity of a waiver of fifth amendment rights as long as it was voluntarily, knowingly and intelligently made, and then determined that since defendant had voluntarily signed the waiver form prior to making any of the three confessions and because he admitted familiarity with *Miranda* warnings and knowledge of the implications of a waiver thereof, it was valid.

With respect to defendant's contention that a higher standard than that stated above is required for a waiver of the sixth amendment right to counsel—the very argument made by defendant in the case before us—the court in *Owens* noted that the United States Supreme Court expressly reserved ruling on that question in *Brewer v. Williams* (1977), 430 U.S. 387, 51 L. Ed. 2d 424, 97 S. Ct. 1232, and that lower courts which have addressed the issue were not in agreement thereon. Stating, however, that even if it were to accept defendant's argument that in order to understandingly waive his sixth amendment right to counsel he was entitled to know that a complaint had been filed charging him with the murder, the court held that since the testimony established that he "in fact possessed somewhat similar information" in that he admitted knowing that he was being held for questioning about a murder, that he had been given, and was familiar with, *Miranda* warnings, and that he knew he had the right to have an attorney present, the waiver was valid and the statements admissible "irrespective of whether sixth amendment rights had attached at the time [they] were made." *People v. Owens* (1984), 102 Ill. 2d 88, 103, 464 N.E.2d 261, 267.

We think that the circumstances preceding the making of defendant's statements in the instant case bear a striking similarity to those in *Owens*. The record here establishes that when asked by the arresting officer whether he understood "what this is about," defendant responded in the affirmative. He was then advised of his *Miranda* rights and thereafter requested, and was provided with, an attorney who—it is undisputed—represented him at the extradition hearing in Beloit. Furthermore, at some time while in custody there he telephoned his mother, informed her that he had been arrested and charged with murder, and requested that she contact Watson. Finally, although he was advised of his constitutional rights once more during

the return trip to Chicago and stated that he understood them, he nevertheless initiated a conversation about this case and made the statement he now claims was obtained illegally. In our view, defendant's actions, particularly his two requests for counsel, indicated an appreciation by him of the gravity of the situation and an understanding of his constitutional rights. Therefore, even if we were to accept his argument that the filing of the complaint constituted the commencement of adversarial proceedings and thereby activated his sixth amendment right to counsel—which, we emphasize, this opinion should not be interpreted as holding—under the reasoning in *Owens*, defendant knowingly and effectively waived that right and thus rendered the statements admissible.

Having so found, it is clear that defendant's correlative argument, that the oral and written statements he made to the assistant State's Attorney after consultation with his own attorney should have been suppressed as having been tainted by the first statement, is without merit.

■ Defendant next contends that his sixth amendment right to counsel was also violated by the improper admission of testimony which "disclosed by implication the substance of privileged communications between [him and his pre-trial attorney.]" The essence of his argument is that the introduction of Assistant State's Attorney Pietrucha's testimony that an attorney is prohibited from revealing what was said to him or her by a client—which followed the testimony of Cassandra Watson, that she had a conversation with defendant after his arrest and that she subsequently withdrew from the case—was calculated to insinuate that he had admitted to her that he killed Duncan and that Watson withdrew on account of that admission but that because of the attorney-client privilege she was prohibited from so testifying. The State argues that, to the contrary, Pietrucha's testimony was offered to clarify why Watson had not testified to the substance of her conversation with defendant and "to dispel a possible impression that she was told something bad by [him]."

Preliminarily, we note that defendant does not assert actual disclosure of privileged communications by either Watson or Pietrucha, nor is there anything in the record to suggest that the prosecution had any knowledge of what defendant told Watson during their two-hour conversation. Rather, defendant's position is that through Petrucha's testimony the State wrongfully inferred that he had made incriminating statements, which in fact he did not make. Since the attorney-client privilege, which stems from the protections afforded by the sixth amendment right to counsel, applies only to those com-

munications made by a client to an attorney (*People v. Adam* (1972), 51 Ill. 2d 46, 280 N.E.2d 205, *cert. denied* (1972), 409 U.S. 948, 34 L. Ed. 2d 218, 93 S. Ct. 289), we see no basis for, nor has defendant cited any authority in support of, his claim that his right to confidential counsel was violated.

Moreover, although we, like defendant's trial counsel, question the relevance of Pietrucha's testimony, regardless of the State's motive for introducing it, we do not see what prejudice defendant suffered as a result thereof. The record reveals that in addition to the testimony summarized above, Watson stated, on cross-examination, that as an attorney specializing in criminal defense, she often represented persons charged with murder and other serious felonies and that her reasons for withdrawing from this case were personal ones unrelated to the charges against defendant. Upon conclusion of her testimony, the trial court advised the jury that her reasons for withdrawing had no significance to the case. Similarly, following Pietrucha's testimony, the trial court admonished the jurors that they should not infer that by testifying, Watson was in any way cooperating with the State in its prosecution of defendant. We therefore believe that any implication which, according to defendant, might have been intended by the State through the challenged testimony was adequately dispelled by the trial court, and that after viewing the record in its totality, he was not denied a fair trial by its admission.

■ ■ Defendant also contends that he was denied his sixth amendment right to confrontation and the right to a fair trial by the admission of prejudicial hearsay testimony, that the police officers did not consider Williams a suspect because they verified his alibi by talking to his relatives—none of whom were called as witnesses at trial.

On direct examination of Officer Ptak, the following exchange took place:

"Q. [ASSISTANT STATE'S ATTORNEY]: Did you ask him [Williams] if he knew anything about the death of Dara Duncan?

A. [OFFICER PTAK]: Yes.

Q. Did he give you any alibis as to where he might have been at the time of the death?

A. Yes.

Q. Did you check those alibis out?

A. Yes, sir.

Q. Was Edmund Williams ever a suspect in this case?

A. No, sir.

Q. Was he ever charged?

A. No he was not.

\* \* \*

Q. Did you double check some of the information he had given you?

A. Yes, after talking with [defendant], we did.

Q. Was there any irregularity in what he [Williams] had told you?

A. No."

Thereafter, Officer Duffin testified as follows:

"Q. After reading [defendant's] statement, was there any further investigation done with respect to Mr. Edmund Williams?

A. Yes.

Q. What was that?

A. We talked to all of his relatives to verify his account [of] where he was relative to the allegations made against [him] by [defendant].

Q. And did that check out or not?

A. Yes, it did."

Finally, in his remarks concerning the fact that defendant had fled to Wisconsin, the prosecutor said, "Edmund Williams had no reason to flee. \* \* \* [He] had an alibi and it was checked out by the police. It was verified."

Defendant maintains that this testimony was inadmissible hearsay because it was based on information outside the officers' knowledge and was offered to prove the truth of the matters asserted, *i.e.*, that Williams could not have committed this murder because relatives—whose credibility the jurors were unable to evaluate—had vouched for his alibi. He argues that the prejudice resulting from this testimony and the prosecution's use of it in closing argument is evidenced by a note from the jury during deliberations asking why no family member had been called as a witness to verify Williams' alibi and requesting to see a transcript of his testimony. The State initially responds that defendant has waived any error which might have resulted from this testimony by failing to object to it at trial or raise it in his post-trial motion.

As a general rule, such omissions act as a waiver, even where constitutional questions are involved, and preclude a defendant from raising those issues as grounds for reversal on review. (*People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856.) While defendant concedes the absence of any objection to the testimony, he urges us to consider this issue under the plain-error doctrine expressed in Supreme Court Rule 615(a), which provides: "Plain errors or defects affecting substantial

rights may be noticed although they were not brought to the attention of the trial court." (87 Ill. 2d R. 615(a).) It is well settled, however, that the plain-error exception to the general waiver rule is a limited one and does not operate as a general savings clause preserving for review all errors involving substantial rights whether or not they have been raised in the trial court, and should be invoked only where the evidence is so closely balanced that "there is a possibility that an innocent person may have been convicted due to some error which is *obvious* from the record" or "[where the] errors are of such magnitude that the commission thereof denies the accused a fair and impartial trial." (*People v. Carlson* (1980), 79 Ill. 2d 564, 576-77, 404 N.E.2d 233, 238.) (Emphasis added.) The rationale for the rule, as stated by the supreme court in *Carlson*, is that "[i]f a timely objection is made at trial, either to improper interrogation, or to an improper remark by counsel to the jury, the court can, by sustaining the objection or instructing the jury to disregard the answer or remark, usually correct the error. *** Otherwise, counsel, by not giving the court the opportunity to prevent or correct error at trial, will gain the advantage of obtaining reversal through his own failure to act, either intentionally or inadvertently." 79 Ill. 2d 564, 577, 404 N.E.2d 233, 239.

In this regard, the record here reveals that in his opening statement, defense counsel said:

"You will also hear that the police arrested Edmund Williams. *** [He] then tells them that he knew nothing about the murder. The police then tell [him], 'We know that you were in the apartment. We know that you knew this young lady. We know that you had sex with [her]. *** We are going to charge you with this murder.' And after Edmund Williams hears that, he says, 'No, I didn't do it. [Defendant] did it.' *** You will find out that Edmund Williams admitted that he did not tell anybody that [defendant] killed the young lady until after he himself was going to be charged with the murder."

Irrespective of whether these remarks were an accurate representation of what the evidence did ultimately establish, we initially note that through them, defense counsel set out, as an important portion of his defense theory, not only that *he* knew that Williams was the killer but that at some time during their investigation, the police believed so as well. Given that fact—which defendant does not dispute—we believe that the trial court reasonably could have inferred that defense counsel intentionally refrained from objecting to the police officers' testimony concerning that very point because he intended to discredit that testimony either through cross-examination of them or

by the introduction of the contradictory evidence which he professed in opening statement would be presented. Indeed, that appeared to be counsel's intention when, at the outset of his cross-examination of Duffin, he himself asked "Investigator, you said that you checked out the alibi that Edmund Williams gave you, is that right?" and again, when he asked Ptak, "Now, you said that Ed Williams gave you the information and you checked that out?" In view thereof, we see no plain error on the part of the trial court in admitting—or more precisely, in failing to exclude—the testimony at issue. As stated by the supreme court in *People v. Precup* (1978), 73 Ill. 2d 7, 382 N.E.2d 227, when presented with an analogous situation involving the question of whether it was plain error for the trial court not to have declared a mistrial based on the introduction of certain conflicting alibi statements made by the two codefendants who were represented by the same attorney, "We are not prepared to say that the trial court in this case committed error by not *sua sponte* interrupting the trial and taking whatever action would have been appropriate ***. It would have been entirely reasonable for a trial judge to assume that it was part of the defendant's strategy to permit the police officer to testify as to the statements made ***. The interruption of this strategy may have, in itself, constituted error." 73 Ill. 2d 7, 17, 382 N.E.2d 227, 231.

Likewise, with respect to the question of whether it was plain error for the prosecutor to introduce the testimony in the first instance, we note again that it was defendant, not the State, who originally interjected into the trial that Williams was not only a suspect but that the police had actually arrested him and threatened to charge him with this crime. Having done so, defendant cannot now complain that the prosecution, which bears the burden of proving guilt beyond a reasonable doubt, thereafter introduced, without objection, evidence intended to refute those assertions. Furthermore, defense counsel made use of the testimony in closing argument when, in challenging the credibility of the officers' testimony that Williams was not a suspect and pointing out that he had been detained, fingerprinted, and compelled to furnish fingernail clippings, he then stated:

> "Let's see what else they [the officers] did. *** They told you, 'We checked out Edmund Williams' alibi.' Didn't Edmund Williams tell you where he was himself? Edmund Williams says, 'I was at Thomas Leverston's house.' The police never did talk to Thomas Leverston. Thomas Leverston said, 'he [Williams] was not at my house.' All the police got to do is go ask him. They didn't check out anybody's alibi."

Accordingly, we find that defendant has waived this issue for purposes of review. See *People v. Young* (1983), 115 Ill. App. 3d 455, 450 N.E.2d 947.

In any event, we have often held that testimony which reflects an investigatory procedure entirely within the personal knowledge of the police officers is properly admissible as nonhearsay evidence (*People v. Young* (1983), 115 Ill. App. 3d 455, 450 N.E.2d 947; *People v. Meredith* (1980), 84 Ill. App. 3d 1065, 405 N.E.2d 1306; *People v. Egan* (1978), 65 Ill. App. 3d 501, 382 N.E.2d 477), even though the logical inference drawn therefrom is that the information they received motivated their subsequent conduct (*People v. Hunter* (1984), 124 Ill. App. 3d 516, 464 N.E.2d 659). In this case, Officer Ptak testified that he checked Williams' alibi; that he found no "irregularity" therein; and that Williams was neither considered a suspect in this crime nor charged with it. Since Ptak did not testify to or reveal the substance of any out-of-court statements or conversations, but merely related what methods he employed in—and the results of—his investigation, we believe the evidence was competent. Similarly, with respect to Officer Duffin's testimony regarding the verification of Williams' alibi by his relatives, we note again that the prosecutor did not ask—nor did Duffin reveal—what they told him, and while omission of any reference by Duffin to the unidentified relatives would have been preferable, we do not think that its inclusion substantially altered the nature or purpose of the testimony, as that offered to explain how the police conducted their investigation and why they reached the conclusions they did. Furthermore, defendant's argument that the testimony was incompetent because it was not based upon the officers' personal knowledge of Williams' whereabouts at the time of the murder is not well founded. Common sense dictates that the police are rarely so fortunate as to be eyewitnesses to or possess other independent, personal knowledge of the circumstances of any given crime they are assigned to investigate, but must instead rely upon information supplied to them by persons to whom they speak in the course of such investigation. Thus, the critical inquiry under the authorities we have cited is not whether Ptak and Duffin had personal knowledge of Williams' activities on the day of the murder, but only whether they had personal knowledge of the investigatory procedures employed in determining that he was not involved therein. Having testified that they were assigned to investigate this murder the morning after it occurred and that they interviewed more than 30 people, including Williams and defendant, the investigatory procedures utilized clearly were within their knowledge.

34

Finally, even assuming, *arguendo*, that defendant had not waived this issue and that the challenged testimony was inadmissible hearsay, we disagree with defendant's assertion that the note from the jury asking why there was no testimony from Williams' relatives regarding his whereabouts on the afternoon of the day in question established that its admission was so prejudicial as to have denied him a fair trial. He posits that the note indicated the jurors' concern about the lack of evidence corroborating Williams' alibi and, in substance, that the verdict established that the question of Williams' credibility was resolved for them by the officers' testimony, thereby usurping their role as triers of fact. We believe that, to the contrary, the note demonstrates that the jurors did *not* categorically accept the officers'—and thus Williams'—testimony that he had an alibi, and their verdict indicates that they nevertheless found the remaining evidence sufficient to support a finding of defendant's guilt.

■ Plaintiff correlatively contends that his trial counsel's failure to object to the admission of the alleged hearsay testimony constituted ineffective assistance of counsel. In order to prevail on such a claim, a defendant must show both that his counsel was actually incompetent as reflected in the performance of his duties as a trial attorney and that the incompetence was sufficient to affect the outcome of the trial. (*People v. Lewis* (1981), 88 Ill. 2d 129, 430 N.E.2d 1346.) However, a reviewing court will not extend its examination of counsel's performance to areas involving the exercise of judgment, trial tactics, or strategy (*People v. Conley* (1983), 118 Ill. App. 3d 122, 454 N.E.2d 1107) nor focus on isolated instances of alleged incompetence, but must instead consider the totality of circumstances at trial (*People v. Davis* (1981), 103 Ill. App. 3d 792, 431 N.E.2d 1210).

■ In this case, it appears—as we have noted above—that the absence of any objection to the alleged hearsay was a tactical decision based on counsel's professed intention to refute the officers' testimony that Williams was not a suspect and thereby discredit their testimony and bolster the defense theory. Moreover, since we have found that admission of the testimony was not reversible error, it logically follows that failure to object to its admission does not constitute a ground for reversal, particularly since defendant has failed to show that the outcome of the trial would have been otherwise had counsel made such an objection. Finally, the record establishes that defense counsel presented an organized opening statement, skillfully directed the testimony of defense witnesses, vigorously cross-examined the State's witnesses, made numerous timely and appropriate objections, knowledgeably argued his positions in sidebar discussions, delivered a

cogent closing argument, and filed timely motions for a directed finding, for judgment *n.o.v.* (which was granted as to the rape conviction) and for a new trial. Thus, when viewing the trial as a whole, we find no fault in counsel's performance and believe that defendant was competently represented.

■■ ■ Defendant further contends that certain remarks by the prosecutor during closing argument deprived him of a fair trial by (a) focusing attention on his failure to testify, (b) shifting the burden of proof to him, and (c) placing the integrity of the State's Attorney's office behind the credibility of the State's witnesses.

Initially, we note that there were no objections to the remarks at trial, nor were they raised as a ground for a new trial in defendant's post-trial motion. It is well settled that failure to make a timely objection ordinarily constitutes a waiver of any improprieties in closing argument unless the comments were so inflammatory or prejudicial as to deny defendant a fair trial. (*People v. Owens* (1984), 102 Ill. 2d 88, 464 N.E.2d 261; *People v. Jackson* (1981), 84 Ill. 2d 350, 418 N.E.2d 739.) Thus, the inquiry on review is twofold—whether the remarks were improper; and, if so, whether they rose to the level of plain error.

In the recently issued opinion of *United States v. Young* (1985), 470 U.S. ___, 84 L. Ed. 2d 1, 105 S. Ct. 1038, the United States Supreme Court discussed the proper bounds of advocacy in criminal trials and the scope of the plain error doctrine in reviewing allegations of improper prosecutorial argument. Noting that while prosecutorial misconduct in argument is not to be condoned, Justice Burger—writing for the court—stated, "the plain error exception to the contemporaneous objection rule is to be 'used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result [citation].' *** Reviewing courts are not to use the plain error doctrine to consider trial errors not meriting appellate review absent timely objection—a practice we have criticized as 'extravagant protection [citation]'." *United States v. Young* (1985), 470 U.S. ___, ___, 84 L. Ed. 2d 1, 12-13, 105 S. Ct. 1038, 1047.

Keeping these principles in mind, we turn then to the remarks complained of in the instant case, all of which were made in the following portion of rebuttal closing argument:

> "Now, the case that we have presented to you, we have to take it as we get it. We don't go out and make up facts. We don't go out and find witnesses. We presented a solid case to you, a case that proves him, beyond any doubt, not reasonable, unreasonable, beyond any doubt. You know that he killed that

young girl.

The Defense case, which presumably would contest our case, the Defense case, I didn't know whether to laugh or cry. It was pathetic. It was like a family reunion where nobody knew each other. That's all you heard from the Defense. You didn't hear any testimony whatsoever from the Defense that Larry was not the one that killed Renee Duncan, not one shred of evidence did you.

So, you heard that one man, Mr. Ivy say, well, yeah, Edwards said that Larry was not the one that killed Renee. Well, of course. Larry's brother was standing right there. You think Edward is going to come clean in front of a stranger and Larry's brother? Of course not.

So, in evaluating our case versus their case, *** just remember where our case lead [*sic*] you and where the Defense case led you."

Defendant argues that the entire passage quoted above was intended to focus the jury's attention on his failure to testify, and additionally, that the prosecutor's reference to the absence of any testimony on defense that he did not kill Duncan was untrue and had the effect of shifting the burden of proof to him. The State responds that the single reference to the absence of any substantial evidence refuting the State's case was a proper comment on the strength of the State's evidence and the weakness of the evidence defendant chose to present in his defense.

The appropriate test for determining whether a defendant's right to remain silent has been violated is whether " 'the reference [was] intended or calculated to direct the attention of the jury to the defendant's neglect to avail himself of his legal right to testify.' " (*People v. Dixon* (1982), 91 Ill. 2d 346, 350, 438 N.E.2d 180, 182-83.) However, the State may comment on the uncontradicted nature of the case, even if the defendant is the only person able to controvert the State's evidence. *People v. Cart* (1981), 102 Ill. App. 3d 173, 429 N.E.2d 553.

Here, the State presented several witnesses who testified to seeing defendant and Duncan together between 7 and 8:30 on the night of the murder—which, according to defendant's statement, was between 1 to 2½ hours after Williams killed her. The State also introduced the testimony of Williams that defendant admitted killing Duncan, and that of the police officers that although he first denied any knowledge of or involvement in the murder he later recanted that statement and admitted that he was present at the scene of the mur-

der, engaged in sexual relations with Duncan, and assisted in the subsequent disposal of her body. In contrast, the evidence presented by the defense consisted—with the exception of Ivy's testimony that Williams told him defendant did not kill Duncan, which the prosecutor acknowledged—primarily of testimony relating to his family and the circumstances of his flight to Beloit. Thus, we find that the remarks were not intended to focus undue attention on defendant's failure to testify or shift the burden of proof to him, but, rather, were appropriate and accurate commentary on the weight of the evidence presented at trial.

Likewise, it cannot be said that the references by the prosecutor to "we" in the first paragraph of the challenged passage improperly placed the integrity of the State's Attorney's office behind the credibility of the State's witnesses. Unlike the argument made in *People v. Valdery* (1978), 65 Ill. App. 3d 375, 381 N.E.2d 1217, the case on which defendant relies, the prosecutor here did not express his personal belief in the credibility of the witnesses or comment on their high quality or integrity. To the contrary, the prosecutor's prefatory statement that "[t]he case we have presented to you, we have to take it as we get it," can just as easily be interpreted as an acknowledgement that the State's case, as presented through its witnesses, was not flawless. Moreover, since the prosecution of this case was conducted by two assistant State's Attorneys, it is likely that the jury took the remark, "[w]e presented a solid case to you," simply as a reference to himself and his co-prosecutor rather than to the office they represent. Furthermore, we do not believe that any improprieties in these comments were so inflammatory or prejudicial as to deny defendant a fair trial, or so flagrant as to threaten deterioration of the judicial process. See *People v. Owens* (1984), 102 Ill. 2d 88, 464 N.E.2d 261.

■ Defendant finally contends—and the State apparently concedes—that under the recent supreme court holding in *People v. Jordan* (1984), 103 Ill. 2d 192, 469 N.E.2d 569, the imposition of an extended term of 25 years on his conviction for indecent liberties with a child was improper because that offense was not the most serious one for which he was convicted.

Section 5—8—2(a) of the Unified Code of Corrections (Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—2(a)) provides:

> "A judge shall not sentence an offender to a term of imprisonment in excess of the maximum sentence authorized by Section 5—8—1 for the class of the most serious offense of which the offender was convicted unless the factors in aggravation set

forth in paragraph (b) of Section 5—5—3.2 were found to be present."

The *Jordan* court, reiterating its earlier holding in *People v. Evans* (1981), 87 Ill. 2d 77, 429 N.E.2d 520, and resolving the debate over the interpretation of this provision which has resulted in conflicting opinions from this court in the recent past, stated: "[W]hen a defendant has been convicted of multiple offenses of differing classes, an extended-term may only be imposed for the conviction within the most serious class and only if that offense was accompanied by brutal or heinous behavior." (*People v. Jordan* (1984), 103 Ill. 2d 192, 206, 469 N.E.2d 569, 575.) It is therefore necessary that we reduce the sentence on defendant's conviction for indecent liberties with a child to a term of 15 years—the maximum allowable sentence for a Class 1 felony—to be served concurrently with the 50-year sentence for murder. Ill. Rev. Stat. 1983, ch. 38, par. 1005—8—1(a)(4).

For the reasons stated, we affirm defendant's convictions for murder and indecent liberties with a child, and we affirm the extended sentence of 50 years imposed for the murder conviction; but we reduce the sentence for indecent liberties with a child from 25 years to 15 years, the maximum allowable by law.

Affirmed as modified.

MEJDA, P.J., and LORENZ, J., concur.