THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
WILLIAM P. LEGER, Defendant-Appellant.

Fifth District   No. 5—89—0405

Opinion filed February 21, 1991.

334

Daniel M. Kirwan and Michelle A. Zalisko, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Tom Foster, State's Attorney, of Shawneetown (Kenneth R. Boyle, Stephen E. Norris, and Scott A. Manuel, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE HARRISON delivered the opinion of the court:
The defendant, William P. Leger, was charged by a Gallatin County information with murder in the first degree and armed violence in connection with the death of Mary Sue Leger. (Ill. Rev. Stat. 1987, ch. 38, pars. 9—1(a)(1), 33A—2.) Following a partially stipulated bench trial, defendant was found guilty of second-degree murder. (Ill. Rev. Stat. 1987, ch. 38, par. 9—2(a)(1).) The trial court sentenced defendant to a 30-year term of imprisonment, to run consecutively to a sentence of death previously imposed in Saline County.

Defendant presents the following arguments on appeal: (1) that the State failed to prove that he had the requisite intent to commit the offense, given his defense of voluntary intoxication; (2) that the trial court erred in ordering his sentence to run consecutively to his Saline County death sentence; and (3) that the trial court erred in imposing an extended-term sentence where the statutory aggravating factors applied were improper or unconstitutional.

At defendant's bench trial, the State presented stipulated evidence, *inter alia*, that Mary Sue Leger, defendant's estranged wife, died of gunshot wounds received at her home in Ridgeway, Illinois, between 10:30 and 11 p.m. on September 4, 1987. At approximately 11 p.m. on the same evening, defendant entered the Eldorado, Illinois, home of his ex-wife, Susan Newman, and her husband, Monte Newman, and shot each three times. Susan Newman died from the gunshot wounds. As defendant fired the third shot at Mr. Newman, he stated, "As for you m----- f-----."

Defendant arrived at his parents' residence in Eldorado about 11 p.m. on September 4, and asked for some pain pills. Dorothy Leger, defendant's mother, noticed some dark stains on defendant's shirt and

asked if he had been fighting. Defendant went outside, brought in a .38-caliber revolver, emptied six spent shell casings from the gun and said, "I've killed those two whores and that man." Defendant's father, William P. Leger, Sr., said to defendant, "You're crazy; you're drinking." Defendant replied, "No, I'm not crazy; I did it." Defendant then told his father, "Don't never [*sic*] do to my mom what I've done." As defendant left the Legers' residence, he warned his parents, "Don't touch that gun; the police will be down to get it."

Sometime before midnight, defendant purchased gas at the Kerr-McGee station in Galatia, Illinois. A station employee observed that defendant was staggering and unsteady on his feet while putting the gas into his car. At approximately 12 midnight, Galatia police officer Joe Akins came upon defendant's car. Defendant proceeded to pull off the highway without Akins turning on his siren or overhead lights. After confirming defendant's identity, Officer Akins arrested defendant, who stated to Akins, "Be sure they know you're the one I let catch me, because it might help you out later."

At the time of defendant's arrest, Officer Akins noticed a strong odor of alcohol on defendant's breath and believed him to be intoxicated. However, Illinois State Police Trooper Ron Towery and Special Agent Larry Huggins, who helped process defendant at the Eldorado police department between 1 and 2 a.m. on September 5, 1987, smelled no alcohol about defendant and did not believe defendant to be intoxicated. Defendant was able to remove his clothing unassisted and had no trouble understanding the officers' instructions and questions, nor in giving detailed personal history information.

The projectiles recovered at the scene and from Mary Sue Leger's body were fired from the .38-caliber revolver recovered from defendant's parents. Other tests showed that when Ms. Leger was shot, the muzzle of the gun was in close proximity to her body and that the black sooty areas on a pair of pink slacks found at the scene were consistent with draping the slacks over the muzzle and cylinder of the gun in an attempt to muffle and hide the noise of the shots. Finally, it was stipulated that any evidence of the murder of Susan Newman and attempted murder of Monte Newman should be considered only for the limited purpose of determining whether or not defendant was intoxicated and/or in a drugged condition to the extent that he was incapable of acting knowingly or with intent.

Defendant presented stipulated evidence, *inter alia*, that he was "intoxicated, wild, and crazy" when he arrived at his parents' home about 11 p.m., and that he ingested an unknown quantity of pills at that time. Officer Akins would have testified that he told defendant at

the time of his arrest that he was "blitzed and didn't know what was going on." Bartenders at the American Legion Post and Knights of Columbus Hall in Ridgeway, Illinois, would have testified that defendant consumed several beers at each of their establishments on the evening of September 4, 1987. Additionally, an employee of the Egyptian Mental Health Department, who interviewed defendant at the Saline County jail on the afternoon of September 5, 1987, would have testified that defendant appeared to be confused and not completely aware of what was going on around him.

Myra Moore, an alcoholism and addictions counselor and psychiatric nurse, would have testified that alcoholic blackouts do occur in some individuals, allowing them to act normally and perform ordinary tasks while later having no recollection or memory of what took place. Ms. Moore had had professional contacts with defendant prior to September 4, 1987, wherein defendant told her that he had suffered incidents of alcoholic blackouts. However, the State stipulated that on cross-examination, Ms. Moore would have testified that, generally, persons suffering from alcohol- and/or drug-induced amnesia do not commit crimes or violent acts but rather perform only simple everyday tasks.

Several witnesses would have testified regarding the various prescription medications that defendant was taking and the enhanced effect achieved by combining those drugs with alcohol. A physician would have testified that the drugs taken by defendant, when combined with alcohol, could have prevented him from forming the requisite intent to kill. Another professional would have testified that in February 1987, defendant was suffering from depression and emotional problems arising from his previous and impending divorces. Additionally, five witnesses would have testified to defendant's reputation for nonviolence.

Defendant testified at the partially stipulated bench trial that he had previously been married to Susan Newman and was in the process of divorcing Mary Sue Leger when she died. Defendant described injuries that he had received working as a coal miner and stated that on September 4, 1987, he had taken four types of prescribed pain medications. Defendant gave a detailed account of his activities on September 4, 1987, which included several visits to the American Legion Post and Knights of Columbus Hall. Defendant last remembered drinking at the Knights of Columbus Hall around 6 p.m. He did not recall shooting Mary Sue Leger or Monte and Susan Newman, and stated that his next memory was of the Saline County jail. Defendant recalled drinking five beers and one double whiskey during a five- to

six-hour period on September 4, but admitted that he had drunk an equal amount in one day during the month previous to September 4 and indeed that he drank practically every day.

As part of the stipulated evidence, the parties agreed that the evidence was sufficient to support the finding that defendant acted with an unreasonable belief in self-defense or that he was acting under a sudden and intense passion resulting from serious provocation by Mary Sue Leger. The trial court found defendant guilty of second-degree murder based upon the presence of the mitigating factor of an unreasonable belief in self-defense.

■■ ■ It is clear that when the defense of intoxication to the crime of murder is raised, the issue is not whether the defendant was intoxicated on the date in question, but whether the defendant had the requisite mental state for murder. (*People v. Zynda* (1977), 53 Ill. App. 3d 794, 809, 368 N.E.2d 1079, 1090.) Voluntary intoxication is an affirmative defense to second-degree murder only if the condition is so extreme as to suspend the power of reason and render the defendant incapable of forming the specific intent to kill or do great bodily harm. Ill. Rev. Stat. 1987, ch. 38, pars. 6—3(a), 9—1(a)(1), 9—2(a); see also *People v. Baczkowski* (1989), 180 Ill. App. 3d 17, 21, 535 N.E.2d 484, 487.

■ It is the function of the trier of fact to determine the existence of the requisite intent, and that determination will not be disturbed on review unless it clearly appears that there exists a reasonable doubt as to defendant's guilt. (*People v. Migliore* (1988), 170 Ill. App. 3d 581, 586, 525 N.E.2d 182, 186.) Based upon the record before us, we reject defendant's contention that the State failed to prove beyond a reasonable doubt that he was capable of forming the proper mental state for murder.

■■ ■ The intent to kill may be inferred from the character of the assault, the use of a deadly weapon, the issuance of threats, and the circumstances surrounding the incident. (*People v. Anderson* (1982), 108 Ill. App. 3d 563, 566, 439 N.E.2d 65, 68; see generally *People v. Bradney* (1988), 170 Ill. App. 3d 839, 525 N.E.2d 112 (finding that defendants' voluntary intoxication was not so extreme as to prevent them from forming requisite intent to commit burglary was sufficiently supported by evidence that one or both defendants had worn gloves to avoid leaving fingerprints).) Here, the stipulated evidence showed that during the time defendant claimed to be suffering an "alcoholic blackout," he shot his estranged wife three times at close range, using a pair of slacks draped over the muzzle of the gun in an attempt to muffle the noise. Defendant then drove his car from

Ridgeway to Eldorado and proceeded to shoot the Newmans, making a threatening statement to Monte Newman as he fired the final shot. We agree with the State that while this statement was made during a separate incident, its occurrence, along with the circumstances of Ms. Leger's death, show defendant was capable of acting with intent during his alleged blackout.

Defendant's conversations with his parents and police, immediately following his commission of the crimes, also demonstrate an ability to function that belies his affirmative defense. Defendant drove to his parents' house, admitted the crimes, and told his father to never do what he had done. He then warned his parents not to touch the gun he had just emptied because "the police will be down to get it." Officer Akins arrested defendant after he voluntarily pulled over and told Akins to "[b]e sure they know you were the one I let catch me." These responses by defendant evince a knowledge of his actions and the fact that they were criminal.

Before, during, and after commission of the offense, defendant acted with purpose and with an understanding of the consequences of his actions, in other words, knowingly and intentionally in committing the crime. Thus, there was sufficient evidence to justify the trial court in finding that defendant's level of intoxication did not negate his capacity to form the requisite intent. We therefore conclude that defendant was proven guilty of the crime of second-degree murder beyond a reasonable doubt.

■ The State argues that the remaining issues raised by defendant are waived by his failure to file a post-trial motion. However, the issues challenged by the State as not being preserved for review concern requests that this court reconsider defendant's sentence. In *People v. Thomas* (1990), 193 Ill. App. 3d 525, 527, 550 N.E.2d 29, 31, the appellate court held that a defendant's failure to move the trial court to reduce his sentence does not result in the waiver of the issue of the sentence's severity on appeal. We find the *Thomas* holding to control here, as our review of the case law does not suggest that defendant's failure to file a post-trial motion containing sentencing issues should have a contrary result.

Defendant argues that the trial court erred in ordering his sentence in this case to run consecutively to the sentence of death he received for the murder of Susan Newman. First, defendant claims that the trial court failed to make a finding that a consecutive sentence was necessary to protect the public.

■ Section 5—8—4(b) of the Unified Code of Corrections (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—4(b)) states that the trial court

shall not impose a consecutive sentence unless it is of the opinion, the basis for which the court shall set forth in the record, that such a term is required to protect the public from further criminal conduct by the defendant. However, in *People v. Pena* (1988), 175 Ill. App. 3d 263, 529 N.E.2d 627, it was specifically held that, because the language of this section is permissive rather than mandatory, a defendant's failure to request from the trial court a statement of reasons for a particular sentence waives the issue for review. Thus, where the record reveals no such request by defendant, the matter was not properly presented to the trial court and is waived.

■■ Defendant also alleges that a consecutive sentence may not follow a death sentence. However, the pertinent statutory section states:

"(a) When multiple sentences of imprisonment are imposed on a defendant at the same time, or when a term of imprisonment is imposed on a defendant who is already subject to sentence in this State ***, the sentences shall run concurrently or consecutively as determined by the court." (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—4(a).)

As defendant was indeed "already subject to sentence"—the death sentence—it is clear that a term of imprisonment may be imposed consecutively to that death sentence.

■■ Defendant additionally argues that no useful purpose will be served by the imposition of a consecutive sentence; since defendant will be incarcerated until executed by the State, the public will already be protected from further criminal conduct by him. In *People v. Hines* (1988), 165 Ill. App. 3d 289, 518 N.E.2d 1362, *cert. denied* (1988), 488 U.S. 895, 102 L. Ed. 2d 226, 109 S. Ct. 236, the defendant similarly argued that no useful purpose is served by sentencing a defendant to an extended term consecutive to a sentence of natural life without possibility of release. In rejecting this argument, the court noted that, where otherwise proper, "consecutive sentencing may well be beneficial even under these circumstances should defendant's life sentence be subsequently modified, commuted or reduced." (*Hines*, 165 Ill. App. 3d at 307, 518 N.E.2d at 1373.) The trial court's sentence in the case at bar may serve a similar purpose should defendant's death sentence be modified, commuted, or reduced. We find that the trial court's imposition of a 30-year term of imprisonment consecutive to defendant's existing death sentence was not error.

■■ Defendant next contends that the trial court erred in imposing an extended-term sentence upon him where neither of the statu-

tory aggravating factors given by the court applies. The trial court found that defendant had been convicted of the same or greater class felony within the last 10 years, thus justifying an extended-term sentence under section 5—5—3.2(b)(1) (Ill. Rev. Stat. 1987, ch. 38, par. 1005—5—3.2(b)(1)). That section requires that the previous charges were brought and tried separately and arose out of a different series of acts. (Ill. Rev. Stat. 1987, ch. 38, par. 1005—5—3.2(b)(1).) Defendant does not dispute that the Saline County charges were separately brought and tried, but argues that they did not arise from a different series of acts.

▆▆ At trial, the stipulated evidence showed that defendant shot and killed Mary Sue Leger and Susan Newman, and wounded Monte Newman, between the hours of 10 and 11 p.m. on September 4, 1987. The trial court found that the Leger and Newman shootings were separate courses of conduct for purposes of imposing a consecutive sentence. Defendant accepts this finding, arguing that "[w]hile the shooting here may not have arisen during the same course of conduct as the Newman shootings, *** both shootings arose out of the same series of acts and with the same purpose—to rid [defendant] of all the women who were causing him to suffer emotional problems." However, the term "conduct" refers to an act or series of acts and the accompanying mental state. (*People v. Willis* (1990), 204 Ill. App. 3d 590, 595, 561 N.E.2d 1376, 1380.) Thus, defendant's concession to the court's finding that the Leger shooting was a separate course of conduct is also a concession that it was a separate act.

▆▆ Notwithstanding defendant's concession, the fact that both murder victims had been married to defendant and were "disposed of" by him in a single evening does not mean that the two shootings were part of the same series of acts. Ms. Leger was shot in Ridgeway, Gallatin County, Illinois. Defendant was then required to drive to Eldorado, Saline County, Illinois, in order to accomplish the act of shooting the Newmans. It has been stated that the single course of conduct rule was not adopted to free a defendant from the consequences of a series of crimes, involving separate acts, committed against several individuals. (*People v. Lindsay* (1978), 67 Ill. App. 3d 638, 647, 384 N.E.2d 793, 800.) We feel this statement is equally applicable to the "different series of acts" condition in section 5—5—3.2(b)(1) (Ill. Rev. Stat. 1987, ch. 38, par. 1005—5—3.2(b)(1)). Because these two murders involved shootings of different individuals at separate times and places, we find that they arose out of a different series of acts within the meaning of section 5—5—3.2(b)(1).

▆▆ Therefore, where the trial court properly imposed an ex-

tended-term sentence under section 5—5—3.2(b)(1), it is unnecessary for us to examine the propriety of the other factor relied upon by the trial court—that the murder was accompanied by exceptionally brutal and heinous behavior indicative of wanton cruelty (Ill. Rev. Stat. 1987, ch. 38, par. 1005—5—3.2(b)(2)). (See *People v. McFarland* (1981), 93 Ill. App. 3d 136, 416 N.E.2d 769 (presence of one of statutory factors is sufficient for imposition of extended-term sentence).) It is also unnecessary for us to reach defendant's final argument, since it concerns the constitutionality of this additional aggravating factor.

Based upon the foregoing, we affirm the judgment and sentence of the Gallatin County trial court.

Affirmed.

HOWERTON and CHAPMAN, JJ., concur.