THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ALICIA ABRAHAM, Defendant-Appellant.

First District (5th Division)    No. 1—90—0791

Opinion filed December 30, 1993.—Rehearing denied February 16, 1994.

Rita A. Fry, Public Defender, of Chicago (Pamela Pfrang, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Jane Liechty Loeb, Special Assistant State's Attorney, and Renee Goldfarb, Assistant State's Attorney, of counsel), for the People.

PRESIDING JUSTICE GORDON delivered the opinion of the court:

This is an appeal from the conviction of defendant Alicia Abraham for first degree murder and aggravated battery of a child under an accountability theory. The trial court sentenced defendant to natural life imprisonment on the first degree murder charge and to 30 years on the aggravated battery charge to be served consecutively. On appeal, defendant contends that (1) the State failed to prove her guilty of first degree murder and aggravated battery beyond a reasonable doubt under an accountability theory; (2) her sentence to natural life imprisonment for first degree murder was an abuse of discretion in light of her passive role in the crime; (3) her sentence for aggravated battery of a child must be reduced because she was not given the opportunity to elect to be sentenced under the statute in effect at the time of the offense which imposed a lower sentence for that crime; and (4) her sentence for aggravated battery should be modified to run concurrently with her sentence for first degree murder, instead of consecutively with that sentence. For the reasons set forth below, we affirm defendant's conviction and sentence on the first degree murder charge and reverse and remand for resentencing on the aggravated battery charge.

## FACTS

The facts in this case recite a litany of continuous abuse and torture of two sons of defendant: Lattie McGee, age four, who died as a result of that abuse, and Cornelius Abraham, age six, who was scarred and permanently deformed from that abuse. The facts in this case are virtually undisputed with the focus of the parties' arguments being the implications of these facts.

From April 1987 through August 1987, defendant Alicia Abraham and her four young children lived with Johnny Campbell in an apartment in Chicago. During this period, two of defendants children, Lattie McGee, age four, and Cornelius Abraham, age six, were subjected to "sadistic torture" by Campbell, who was not their natural father.

This abuse began sometime in June 1987 after Campbell determined that Lattie and Cornelius had homosexual tendencies and had been engaging in homosexual acts. Campbell accused the boys of sneaking off to have sex and would beat them, stick needles in their chests and buttocks and make them stand in the corner if they did not admit to this course of behavior. Throughout this period, the children's crying was heard by neighbors on an almost daily basis who also heard a man yelling at the children to shut up and stop crying. Defendant was aware of what Campbell was doing, but never told anyone what was happening.

In late June, Campbell was beating Cornelius with a belt and when Cornelius attempted to escape, Campbell broke Cornelius' tooth by striking him. Then sometime in July, Campbell hit Cornelius' hand with a brush and as a result of this blow, Cornelius could not close his hand properly. He never received medical attention for this injury. Cornelius was also scalded with hot water as punishment.

During this time, Lattie was also suffering constant abuse. On numerous occasions, Campbell would use a tree limb to beat Lattie. On one day, Campbell had Lattie in the bathroom, and was "yanking him back and forth" and as a result a bone popped out in Lattie's back. Campbell hit Lattie again in an attempt to make the bone go back in and the bone popped out in the front of Lattie's body. As a result, a large lump developed in Lattie's throat and his throat became very swollen. After that time, Lattie could not swallow solid food and could barely swallow water. It looked as if there were teeth marks on his gums. Again, defendant was aware of these instances of abuse, but never told anyone.

Cornelius was regularly forced to sleep in the front closet and was beaten by Campbell frequently with switches, extension cords, and belts while he was tied up on a hook in that closet. Lattie was

forced to stay in the bedroom closet with no clothes on and newspapers on the floor for between two and three weeks.

Defendant was present when Cornelius and Lattie were "punished" by Campbell. Cornelius described how he was tied up and hung from his arms in the closet by Campbell for two days during which time his mother was present. He stated that Campbell burned him twice with a lit cigarette when defendant was in the living room. Cornelius also stated that defendant was in the living room watching television when Campbell used an iron to burn Lattie's chest and Cornelius' buttocks.

On at least one occasion, defendant held Lattie while Campbell bound him. After tying Lattie up this time, Campbell hung him in the closet on the clothes rack. At other times, Lattie was hung upside down in the closet while bound. Campbell also tied Lattie to the radiator. Campbell subsequently explained that he kept Lattie tied up so that he wouldn't pick at the sores which had by that time developed on his chest and leg as a result of the abuse.

Campbell would also bathe Lattie two or three times a day because he was afraid that Lattie's wounds were becoming infected. During one of these baths, Lattie screamed that the water was too hot, but Campbell did not believe him. As a result of this scalding and Campbell's harsh scrubbing, skin would come off of Lattie's body. Campbell would also frequently beat Lattie in the bathroom.

On August 12, Campbell was holding Lattie and beating him. As a result of this beating, the skin on Lattie's legs was pulled off. On August 13, 1978, defendant returned home to find Cornelius standing inside the front closet and Lattie tied up in the bedroom closet. She let them out of the closets to use the washroom and then the boys went back to the closet. Defendant and her two other children proceeded to watch television, while Campbell took Cornelius into the bathroom and hit him in the head.

Campbell then took Lattie to the bathroom to wash him and noticed there was a significant amount of pus coming from where Lattie had been poked with the needles. At midnight August 13, Campbell gagged Lattie and taped potato peels to his eyes and put him back in the closet; Cornelius was still in the front closet. Defendant and Campbell went to sleep on the couch with the boys still in the closet.

When defendant awoke on the morning of August 14th, she watched television for an hour. She then checked and found that Cornelius was still in the closet; she did not check on Lattie. When Campbell got up, he checked on Lattie who was still in the other closet. Lattie asked for water and Campbell told him that he could only

have some if he could walk and get it. As they walked, Lattie kept falling and Campbell would pull him back up. Campbell was mad that Lattie had urinated on himself.

Defendant fixed hot dogs which she, Campbell and Cornelius ate; Lattie still could not eat anything. After Campbell ate, he put Lattie back in the closet with tape on his mouth and potato peels on his eyes. When Campbell subsequently went out for an hour and a half, defendant checked on Lattie for a few minutes, and then went back to watching cartoons on television with Lattie back in the closet.

Campbell returned with a tree limb which he showed to defendant, stating that he "might use it." He then took Lattie to the bathroom and defendant went back to the living room and began watching television again. According to Campbell, Lattie fell forward and struck his head on the faucet and went limp while he was bathing him. Campbell thought that Lattie was faking and subsequently hit him hard seven or eight times in the head and stomach. At this time, defendant was sitting in the living room, either combing her daughter's hair or watching television. In a subsequent statement to the police, she said that at some time that day she left the apartment and went to her sister's, returning about half an hour after she left.

When defendant subsequently looked in, she saw Lattie, who was apparently dead at this point, with his hands tied, draped over the bathtub. Campbell was examining Lattie's anus, accusing Cornelius of "ruining" Lattie. Campbell continued to wash Lattie's body for a while and then came out and told defendant that he had killed Lattie.

After this beating, defendant called for medical help, met the paramedics in the lobby, and accompanied Lattie to the hospital. When asked about Lattie's injuries, defendant told the paramedics that the child had been whipped a couple of days earlier and had burned himself in a hot tub a couple of days earlier. She told doctors and the hospital staff that Lattie was injured when he fell in the bathtub, but later admitted that she lied in that respect. The medical examiner determined that the cause of Lattie's death was a subdural hematoma which resulted when Campbell repeatedly beat Lattie in the head. Lattie's left clavicle had been separated from his shoulder and he had a staph infection which resulted in a large abscess near his neck. The abscess, which was the size of a baseball, covered the entire side of his neck and was determined to be a contributing cause to Lattie's death.

An examination of Lattie's body also revealed that he was malnourished and was suffering from bronchial pneumonia. He had ulcerations of different ages on his chest, abdomen, back, and gluteal

area. There were first and second degree burns on his legs and feet. Large bruises, old scars and bite marks were on both sides of his face. Lattie's chest, clavicle, and neck were swollen and bruised and his back and abdomen had pin point scars. He had cigarette burns on the top of his head and his ear and a 6 by 9 inch burn on his gluteal area. There were also ligature scars on his forearms, wrists, hands, and ankles. His pelvis was broken, approximately two weeks prior to his death. Two of Lattie's ribs were fractured, one injury appeared to have occurred two weeks before his death, the other approximately three weeks before his death. Lattie also suffered injuries to his scrotum and penis.

Cornelius was also malnourished and had scattered areas of burns over his body, although his burns were not as extensive as Lattie's. He had rope marks on his wrists and ankles and his left hand was severely and permanently deformed. His left ear drum was perforated.

There was testimony that defendant did not strike either Lattie or Cornelius after Campbell began his course of abuse, although she had administered corporal punishment prior to that time. At no time prior to Lattie's death did defendant attempt to contact the authorities for help or to arrange for medical treatment. Defendant's two other children did not appear to be injured in any way.

In a statement to police, defendant admitted she was aware of Campbell's abuse of Lattie and Cornelius. She denied that Lattie had been burned when questioned by the police, stating that his wounds occurred when he struggled to avoid being tied up. Defendant also claimed to the police that she was not present during a number of the beatings.

Defendant later admitted to a Department of Children and Family Services (DCFS) caseworker that she did not take Lattie to the hospital for treatment of his injuries because she was afraid that she would be accused of that abuse. She also told the caseworker that she attempted to stop Campbell's abuse but could not do so. At trial, Cornelius testified that at no point during any of these beatings and torture did defendant ever intervene and try and stop Campbell, even by way of asking him. We note, however, that a stipulation was offered that if called to testify, certain individuals who treated Cornelius at the hospital on the day of Lattie's death would state that Cornelius had previously told them that his mother had threatened to throw Campbell out of the house if he continued his abuse.

Defendant and Campbell were charged with the first degree murder of Lattie and the aggravated battery of Cornelius. Campbell was subsequently determined to be guilty, but mentally ill by the trial

court and sentenced to life imprisonment. After a bench trial, defendant was convicted of first degree murder for the death of Lattie and the aggravated battery of Cornelius. In finding the defendant guilty, the trial judge commented that defendant assisted in "the most heinous, brutally, sadistic torture of Cornelius, and the most brutally sadistic torture and murder of Lattie McGee" that he had ever seen.

At the sentencing hearing, Campbell claimed full responsibility for the death and asked the court to be lenient on defendant. In mitigation, defendant introduced evidence that she had been abused as a child by an aunt and that she was beaten by Campbell when he used drugs and alcohol.

The trial court sentenced defendant to natural life imprisonment on the murder charge. In sentencing defendant, the trial court spared defendant the imposition of the death penalty, noting that defendant did not actively participate or know prior to or during Campbell's fatal beating of Lattie that Campbell was committing the acts which would result in Lattie's death. The trial court described defendant as being "guilty of the grossest and most atrocious child abuse imaginable for a two and a half month period before Lattie's death."

The trial court also sentenced defendant to 30 years on the aggravated battery charge to run consecutive to the sentence imposed for the murder of Lattie. In so doing, the trial court sentenced defendant under the statute in effect at that time, which classified aggravated battery of a child as a Class 1 felony. Defendant was not given the opportunity to elect to be sentenced under the statute in effect at the time of the offense which classified aggravated battery as a Class 2 felony.

OPINION

On appeal, defendant contends that the State failed to prove her guilty beyond a reasonable doubt of the first degree murder of Lattie and the aggravated battery of Cornelius under an accountability theory. She also raises several alleged errors with respect to sentencing, including that her sentence to natural life imprisonment for Lattie's murder was an abuse of discretion, that she was not given the opportunity to elect to be sentenced on the aggravated battery charge under the statute in effect at the time of the offense, and that the sentence for aggravated battery should be modified to run concurrently with her sentence for murder instead of consecutive to it.

Defendant first contends on appeal that her convictions for first degree murder and aggravated battery on an accountability theory are without basis. She claims that it was Campbell, not she, who inflicted the injuries that precipitated the death of one child and the

maiming of the other. Defendant points to the trial court's finding that she was not aware that Lattie was being fatally beaten and that she was merely present at the scene of the crime.

Defendant's brief cites the appellate court's decision in *People v. Stanciel* (1991), 225 Ill. App. 3d 1082, 589 N.E.2d 557, as support for its position. In that case, the appellate court reversed the conviction of a defendant who had been convicted of the murder of her three-year-old daughter under an accountability theory. Her daughter died after her boyfriend, who had a history of beating the child, ruptured the child's liver and tore her intestines by punching her in the stomach in defendant's presence. The appellate court concluded that although the defendant may have been guilty of neglect, there was insufficient evidence that she aided in the commission of the murder where the evidence only showed that she was present when the fatal blow was struck.

This decision, however, has since been reversed by the supreme court in *People v. Stanciel* (1992), 153 Ill. 2d 218, 239, 606 N.E.2d 1201. Reaffirming the recognized duty of a parent to care for his or her child, the supreme court determined that the evidence presented was sufficient to provide the inference that defendant knew or should have known the serious nature of the injuries that her child was sustaining. (*People v. Stanciel*, 153 Ill. 2d at 237.) The court reasoned that in such an instance, "the [defendant] had an affirmative duty to protect [her child] from the threat posed by [her boyfriend]" which she failed to fulfill when she "ignored the danger posed by [him]." *People v. Stanciel*, 153 Ill. 2d at 237; see also *State v. Williquette* (1986), 129 Wis. 2d 239, 252, 385 N.W.2d 145, 151 (holding that the duty of a mother to protect and care for child permitted prosecution of the mother as a principal for the "overt conduct" of regularly leaving the children in the father's exclusive care and control when she knew that he abused the children in her absence).

■ The holding in *Stanciel* unquestionably supports the affirmance of the defendant's conviction here. Defendant's admitted knowledge that her children were being constantly and severally abused by Campbell necessitated that she take affirmative action to protect them. Although defendant claimed to a DCFS caseworker that she made an effort to stop the abuse, she herself never sought any medical attention for the children, never called the police, and in fact, assisted Campbell in tying one of the children up on a previous occasion, thereby lending encouragement to this course of conduct.

Defendant contends that she was in a different room when some of this abuse occurred. We find this argument utterly meritless. First, the injuries which the children suffered were disfiguring and were

obvious to the naked eye, including the abscess on Lattie's neck which was the size of a baseball, the sores secreting pus on his chest, the thermal burns on his body, and Cornelius' deformed hand. Defendant cannot and does not deny that she observed and was aware of these injuries. As previously noted, defendant also saw Campbell bring a tree limb in with him before the fatal beating, when he said that he "might use it." Moreover, if defendant's neighbors heard the cries and screams of the children on a nearly daily basis, defendant must have heard those same cries and screams if she was in the next room. We therefore conclude that, under *Stanciel*, defendant's conviction for first degree murder and her conviction for aggravated battery under an accountability theory were proper.

Consolidated with the *Stanciel* appeal was the appeal in the case of *People v. Peters* (1991), 224 Ill. App. 3d 180, 586 N.E.2d 469, *aff'd People v. Stanciel* (1992), 153 Ill. 2d 218, 606 N.E.2d 1201, which also involved a mother convicted under an accountability theory for the murder of her child. The supreme court upheld defendant Peters' conviction under an accountability theory even though she was not present when the fatal blow was struck to her 20-month-old child by her boyfriend and had never seen her boyfriend abuse the child. (*People v. Stanciel*, 153 Ill. 2d at 237.) In affirming the conviction, the court noted that the evidence presented showed that defendant (1) knew that her child was being abused by her boyfriend from the marks, bruises and burns on the child's body and (2) allowed her boyfriend to continue to exercise control over the child. (*People v. Stanciel*, 153 Ill. 2d at 237.) Those facts were sufficient to support defendant's conviction.

We note that even before our supreme court's intervention in *Stanciel*, there was a substantial body of case law which established that a defendant could be held legally accountable for the death of her child, even though the fatal blows were actually inflicted by another. These cases looked to whether defendant (1) knew that the child was being abused either through direct observation or from the appearance of the child's injuries (*People v. Ray* (1979), 80 Ill. App. 3d 151, 399 N.E.2d 977); (2) failed to remove the child from the dangerous environment, report the abuse or in some way prevent or oppose the abuse (*People v. Bernard* (1986), 149 Ill. App. 3d 684, 500 N.E.2d 1074); and (3) failed to seek medical attention for the child's injuries (*People v. Peters* (1991), 224 Ill. App. 3d 180, 586 N.E.2d 469). As we have discussed, it is apparent from the aforementioned facts that defendant has, in fact, easily met these infamous criteria. See, *e.g.*, *People v. Ray*, 80 Ill. App. 3d at 156, which also involved a mother being convicted under an accountability theory for the death of her child, where the court stated:

"Even in the absence of any evidence that defendant committed an overt act, the trier of fact could still have found her accountable for the actions of [the codefendant] where uncontradicted evidence established her continued close association with [the codefendant] and her failure to report to authorities any of the incidents of [the codefendant's] abuse of [her daughter]. The foregoing was evidence that defendant shared the common purpose of [the codefendant] and was sufficient to sustain her conviction for the acts of [the codefendant]."

See also *People v. Bernard*, 149 Ill. App. 3d at 694 (upholding defendant's conviction for the aggravated battery of her two minor children under an accountability theory where defendant: (1) continued her relationship with her boyfriend who abused her children; (2) failed to report the abuse of her children; and (3) failed to prevent or oppose the abuse).

Thus, the decision of our supreme court in *Stanciel* need not be perceived as breaking new ground, but as reaffirming existing precedent holding parents accountable for permitting their children to be abused, and in this case killed, even where the precipitating acts are committed by another.

Defendant next argues that the trial court abused its discretion in sentencing her to natural life imprisonment considering her "passive" role in the murder. We disagree.

Sentencing of a defendant is a matter of judicial discretion, and in the absence of a clear abuse of discretion, the trial court's determination will not be set aside. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882; *People v. Ward* (1990), 194 Ill. App. 3d 229, 550 N.E.2d 1208.) The trial court is in the best position to determine the appropriate punishment and its decision is entitled to great weight and deference. (*People v. Perruquet*, 68 Ill. 2d at 154.) A reviewing court should not substitute its judgment for that of the trial court merely because it would have imposed a different sentence. *People v. Younger* (1986), 112 Ill. 2d 422, 494 N.E.2d 145; *People v. La Pointe* (1981), 88 Ill. 2d 482, 431 N.E.2d 344.

Defendant asserts that her conduct was not exceptionally brutal, heinous or indicative of wanton cruelty. She argues that she was not present in the same room when Campbell administered the fatal beating to Lattie and that she did not know prior to or during the fatal beating that that particular beating would occur or prove fatal. She further contends that she never hit either child during that summer although she did assist once in helping Campbell to bind Lattie. However, these attempts to distinguish her conduct from that of Campbell are unavailing.

■ We note that sentences for natural life imprisonment given to defendants convicted under a theory of accountability have been upheld, even though the evidence presented at trial established that it was the codefendant who committed the brutal acts and that the defendant played a comparatively passive role in the crime. See *People v. Wilson* (1993), 257 Ill. App. 3d 670 (sentence of natural life imprisonment imposed on defendant convicted of first degree murder under an accountability theory was not an abuse of discretion even though codefendant was the shooter; defendant's agreement to participate in criminal enterprise, that he alerted codefendant that one of the victims was still alive, that he drove the getaway car and that he left victims dying in street without reporting crime supported life sentence).

On point is *People v. Hines* (1988), 165 Ill. App. 3d 289, 518 N.E.2d 1362. There, the trial court imposed a sentence of natural life imprisonment on a defendant who had been convicted under an accountability theory for the murder of a 16-year-old girl. On appeal, the defendant contended that the sentence was an abuse of discretion because he did not sanction or know that his cohort was murdering the victim at the time because they were out of his sight. The appellate court upheld the natural life sentence even though defendant was not immediately present when the victim's throat was slashed in light of the brutal acts of codefendant and the fact that defendant heard the victim "scream, gurgle, and gasp for air," after her throat had been slashed and left her there dying in a deserted area. *People v. Hines*, 165 Ill. App. 3d at 304.

Defendant's argument concerning her relative passivity ignores the basic and fundamental fact that her failure to intercede to protect her two very young children, in contravention of her duty as a parent to protect and nurture them, directly resulted in death just as surely as if she had struck those blows herself. (See *People v. Tibbs* (1981), 103 Ill. App. 3d 73, 77, 430 N.E.2d 681 (imposition of extended-term sentence proper on defendant convicted under accountability theory for brutal acts of another; "the nature of the act and not the identity of the actor permits the imposition of the enhanced penalty"); *People v. Merritte* (1993), 242 Ill. App. 3d 485, 611 N.E.2d 24.) We find no abuse of discretion here in sentencing defendant to natural life imprisonment.

Defendant next contends on appeal, and the State acknowledges, that her 30-year sentence for aggravated battery must be reduced because at the time of her offense, aggravated battery was a Class 2 felony with a sentencing range between three and seven years. (See Ill. Rev. Stat. 1987, ch. 38, pars. 12—4.3, 1005—8—1(a)(5).) Defendant

correctly contends and the State agrees that she was not advised that she could elect to be sentenced under that statute before the trial court sentenced her under the statute in effect at that point, which classified aggravated battery as a Class 1 felony with a sentencing range between 5 and 30 years. Ill. Rev. Stat. 1991, ch. 38, par. 12—4.3.

■ Accordingly, defendant's 30-year sentence must be vacated because the trial court sentenced defendant under the more severe law in effect at the time of the sentencing without advising her that she could elect to be sentenced under the law in effect at the time of the offense. (See *People v. Hollins* (1972), 51 Ill. 2d 68, 280 N.E.2d 710 (defendant entitled to elect to be sentenced under either the law in effect when the offense was committed or the law in effect at the time of the sentencing); *People v. Anderson* (1981), 93 Ill. App. 3d 646, 417 N.E.2d 663.) In its brief on appeal, the State urges that this court reduce defendant's sentence to the statutory maximum available at the time of the offense, seven years, instead of remanding the case for resentencing. At oral argument, the State revised its request, asking that we impose an extended-term sentence on defendant, thereby reducing her sentence to 14, rather than 7 years. The State argues that although it may be technically correct to remand the matter for resentencing, judicial economy would be served if we would simply alter defendant's sentence on appeal.

We recognize that this court has, in appropriate instances, corrected a defendant's sentence without remanding the matter to the trial court. (See, *e.g., People v. Clemons* (1989), 179 Ill. App. 3d 667, 534 N.E.2d 676; *People v. Bedony* (1988), 173 Ill. App. 3d 613, 527 N.E.2d 916; *People v. Steffens* (1985), 131 Ill. App. 3d 141, 475 N.E.2d 606.) Since the trial court imposed the statutory maximum of 30 years under the new statute, it would not be inappropriate for this court in the interest of judicial economy to impose the statutory maximum available at the time of the offense, namely seven years.

The State, however, now asks us to go one step further and impose an extended-term sentence upon defendant. This would be inappropriate. Although we are cognizant of the need for judicial economy, the imposition of such an extended-term sentence is solidly within the discretion of the trial court (*People v. Kelchner* (1991), 221 Ill. App. 3d 25, 581 N.E.2d 793), which is in the best position to weigh the relevant factors and considerations involved. (*People v. King* (1993), 248 Ill. App. 3d 253, 618 N.E.2d 709.) Since the trial court has not seen fit to impose an extended-term sentence under the new statute, we hesitate to impose an extended-term sentence here from our position as a reviewing court, even though such a sentence would be

16 years less than that sentence originally imposed by the trial court. See Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—2; *People v. Johnson* (1990), 197 Ill. App. 3d 74, 554 N.E.2d 696.

In remanding this case, we are cognizant of the body of case law which provides that when a defendant is sentenced to more than one offense, an extended-term sentence may only be imposed for the more serious offense. (*People v. Jordan* (1984), 103 Ill. 2d 192, 469 N.E.2d 569 (when multiple offenses from different classes are involved, a court may only impose extended-term sentences for the conviction within the most serious class).) Following this general proposition, an extended-term sentence for the aggravated battery would not be possible since the murder was the more serious offense. (*People v. Stevenson* (1990), 204 Ill. App. 3d 342, 562 N.E.2d 330 (extended sentence for aggravated battery improper where defendant was also convicted of armed robbery, a more serious offense).) However, several courts have expressly distinguished the situation where a defendant is sentenced to natural life imprisonment and have allowed the defendant to be sentenced to an extended term on the less serious offense, reasoning that the most serious offense rule only applies where the sentence for the more serious offense is one for a term of years. (See *People v. Young* (1987), 152 Ill. App. 3d 361, 504 N.E.2d 115 (extended-term sentence for armed robbery was not precluded by defendant's sentence to life imprisonment without the possibility of parole for murder); *People v. Travis* (1988), 170 Ill. App. 3d 873, 525 N.E.2d 1137 (defendant's sentence to natural life imprisonment did not preclude extended-term sentences for aggravated criminal sexual assault and home invasion; extended-term sentence for residential burglary must be reduced to statutory maximum as that offense was not in the class of the most serious offenses); *People v. Hines*, 165 Ill. App. 3d at 306 (extended-term sentence for aggravated criminal sexual assault was not precluded by imposition of sentence of natural life imprisonment for murder); *cf. People v. Neal* (1985), 111 Ill. 2d 180, 489 N.E.2d 845 (imposition of extended-term sentence for armed robbery was not precluded by defendant's death sentence for murder).) Moreover, an extended-term sentence could be imposed if the aggravated battery was determined to be a separate act from the murder. (See, *e.g., People v. Leger* (1991), 208 Ill. App. 3d 333, 567 N.E.2d 68.) Under these circumstances, and in view of this case law, the appropriate course would be to remand this case to the trial court for resentencing.

Defendants' final contention on appeal is that her aggravated battery sentence should be modified to run concurrently with, instead of consecutively to, her sentence for murder. Section 5—8—4 of the Unified Code of Corrections provides in pertinent part:

"When multiple sentences of imprisonment are imposed on a defendant at the same time, *** the sentences shall run concurrently or consecutively as determined by the court. ***

(b) The court shall not impose a consecutive sentence *** unless, having regard to the nature and circumstances of the offense and the history and character of the defendant, it is of the opinion that such a term is required to protect the public from further criminal conduct by the defendant, the basis for which the court will set forth in the record." (Ill. Rev. Stat. 1987, ch. 38, pars. 1005—8—4(a), (b).)

Defendant here complains that the trial court failed to provide a basis in the record for the consecutive sentence imposed.

■ We note at the outset that defendant has waived this issue. See *People v. Hicks* (1984), 101 Ill. 2d 366, 462 N.E.2d 473, where our supreme court determined that the requirement contained in section 5—8—4(b) that the basis be set forth in the record is permissive rather than mandatory and that this requirement was waived if defendant failed to request a specific finding. (*People v. Hicks*, 101 Ill. 2d at 374.) At the sentencing hearing below, defendant did not object to the imposition of a consecutive sentence, "did not request a specific finding of the sentencing court relative to the protection of the public, nor did the defendant complain that a basis for the required statutory finding was not sufficiently articulated." (*People v. Hicks*, 101 Ill. 2d at 374.) As such, we determine that defendant waived any error with respect to this issue. See *People v. Suarez* (1991), 238 Ill. App. 3d 110, 606 N.E.2d 1237; *People v. Woods* (1985), 131 Ill. App. 3d 51, 475 N.E.2d 589; *People v. Soloman* (1983), 116 Ill. App. 3d 481, 451 N.E.2d 953.

Even if we addressed the merits of defendant's argument, reversal of the trial court's decision to impose consecutive sentences would not be warranted. It is squarely within the discretion of the trial court to determine whether multiple terms of imprisonment are to be served concurrently or consecutively. Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—4; *People v. Peebles* (1984), 125 Ill. App. 3d 213, 465 N.E.2d 539.

Here, the trial court did not expressly state in imposing consecutive sentences that defendant posed a threat to the public. However, a statement mirroring the words of the statute is not a prerequisite to upholding the imposition of a consecutive sentence. (*People v. Mays* (1992), 230 Ill. App. 3d 748, 595 N.E.2d 1088; *People v. Miller* (1983), 115 Ill. App. 3d 592, 450 N.E.2d 767.) Rather, "[w]hat is required is that the record show that the sentencing court is of the opinion that a consecutive term is necessary for the protection of the public." *People v. Pittman* (1982), 93 Ill. 2d 169, 178, 442 N.E.2d 836.

As we have discussed previously in determining that the sentence of natural life imprisonment was appropriate, defendant's role in the heinous and sadistic torture of her own sons warranted severe punishment. (*People v. Woods*, 131 Ill. App. 3d at 54 (trial court's comments that defendant committed the "ultimate crime" which resulted in "incalculable harm" on victims and showed little remorse was sufficient to uphold imposition of consecutive sentences).) The trial court strongly commented on the brutal, heinous and reprehensible nature of this crime in sentencing defendant. Such strong unequivocal comment would be more than sufficient to indicate that the trial court determined that consecutive sentences were appropriate as defendant posed a threat to the public. (See *People v. Mays*, 230 Ill. App. 3d at 759 (trial court's "strong comments" describing defendant's behavior as "absolutely horrendous" and the "most wantonly brutal and heinous" that he had seen in 30 years and comment that defendant "won't be released a day too soon as far as I'm concerned" indicated its "opinion that the need for public protection warranted a consecutive term"); *People v. Douglas* (1991), 208 Ill. App. 3d 664, 676, 567 N.E.2d 544 (trial court's comments on defendant's criminal history, as well as references to the "facts" and "circumstances" and "gravity" of offense sufficient to support imposition of consecutive sentences even without express statement that defendant posed a threat to the public); *People v. Miller*, 115 Ill. App. 3d at 606 (trial court's comment that the offense of delivery of narcotics is "one of the worst offenses that a person can commit" coupled with comment on defendant's criminal background, without express finding that defendant posed a danger to the public, provided an adequate basis upon which to base consecutive sentences).) Although it may be argued that defendant's threat was limited to her own offspring, it is not for this court to usurp the role of the trial court if the evidence supports, as it does here, that the trial court acted within the proper latitude of its discretion.

For the foregoing reasons, the judgment of the circuit court with respect to defendant's conviction for first degree murder and the resulting sentence of natural life imprisonment is affirmed. The judgment of the circuit court is also affirmed with respect to the imposition of consecutive sentences. The judgment of the circuit court is reversed and this case remanded with respect to defendant's sentence for aggravated battery.

Affirmed in part; reversed in part and remanded.

MURRAY and McNULTY, JJ., concur.