THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. VATENESS JOHNSON, Defendant-Appellant.

Third District   No. 3—89—0006

Opinion filed April 23, 1990.—Rehearing denied May 23, 1990.

Thomas A. Lilien, of State Appellate Defender's Office, of Elgin, for appellant.

Edward Burmila, State's Attorney, of Joliet (Gary F. Gnidovec, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE SCOTT delivered the opinion of the court:

Defendant and her husband, Frank Johnson, were each indicted for two counts of murder and two counts of aggravated battery for the death of Judy Moses, age five, and the beating of her sister

Quiana Moses, age three. After a jury trial, both were convicted on all counts, and defendant was sentenced to concurrent terms of 60 years' imprisonment for each murder conviction and 10 years for each aggravated battery conviction. Frank Johnson was sentenced to concurrent terms of 22 years for murder and five years for aggravated battery. Defendant and her husband both appealed, and in each case, their respective convictions were reversed and new trials ordered on the basis that the trials of each should have been severed. See *People v. Vateness Johnson* (1987), 151 Ill. App. 3d 1049, 504 N.E.2d 178; *People v. Frank Johnson* (1986), 144 Ill. App. 3d 997, 495 N.E.2d 633.

Frank Johnson subsequently pleaded guilty to a reduced charge of involuntary manslaughter and was sentenced to an eight-year term of imprisonment. As part of this plea negotiation, Frank Johnson agreed to testify against defendant if necessary. Defendant was retried before a jury and convicted of two counts of murder and one count of aggravated battery. The trial court subsequently sentenced her to concurrent 60-year terms of imprisonment on the murder convictions and 10 years on the aggravated battery conviction. Defendant now appeals her convictions after retrial. No issues are raised concerning the indictment.

Defendant's second trial was scheduled for November 9, 1988. Prior to selection of the jury, however, defendant moved to have the jury panel discharged on the ground that the Will County jury selection system violated defendant's right to a fair and impartial jury. Defendant argued that the Will County Jury Commission excused numerous prospective jurors without proper grounds in substantial noncompliance with statutory requirements for the jury selection process. The trial court denied the motion after an evidentiary hearing and selection of the jury proceeded on November 11 and 14, 1988.

Judy and Quiana Moses resided with defendant and her family from January 12, 1985, to March 11, 1985. Prior to that time Valencial Morris, the girls' aunt, testified that she cared for the girls on four separate weekends in November and December of 1984 and at that time the girls appeared to be in good health. Evidence was further presented that on February 1, 1985, Garland Armstrong, an insurance agent, was at defendant's home and observed Judy and Quiana Moses to be quiet but with no apparent injuries.

The next date for which evidence was presented was March 11, 1985. On this date defendant indicated that she had to separate the Moses girls after her sons had left for school. She tied Quiana to a bedpost downstairs and tied Judy's wrists to a wrought iron chair in the garage after also binding her ankles together and placing a liga-

ture over her mouth. About noon the same day, she received a ride from Reverend Johnson to the Harris Bank in Chicago and back. She then later contacted Jose Holmes (Holmes) for a ride to look for her apparent boyfriend, Richard Eames (Eames). Defendant and Holmes made several stops in search of Eames and drank beer, champale, and possibly smoked marijuana. Holmes eventually gave defendant a ride home sometime in the evening. Defendant indicated that when she arrived home that evening Judy had been brought into the house. One of the defendant's sons then brought Judy upstairs and laid her down on the living room floor. Defendant described Judy as "fake sleeping" and further stated she went to bed but arose more than once that evening to check on Judy and called a few people, including two nurses, about Judy's condition. One nurse told her the fake sleeping could result from chicken pox and another stated a coma could result, but that the girl would be alright in the morning.

Defendant stated that when she arose at 8 a.m. on March 12, 1985, Judy was still on the floor. Defendant then made breakfast, hoping it would awaken Judy, but it did not. That morning, Frank Johnson fixed the family van, and around noon, placed Judy on the van couch. Defendant, Frank, Quiana, Judy and defendant's youngest son then went to an attorney's office about other matters. Defendant, however, also mentioned to the attorney that Judy and Quiana were rebelling and was referred to the Department of Children and Family Services (DCFS). DCFS then referred defendant and the children to Silver Cross Hospital. Judy Moses was pronounced dead at the hospital, and an autopsy was subsequently performed by Dr. Mira Kalelkar. Dr. Kalekar described Judy's body as dirty with injuries of various ages up to a month or older and in various stages of healing. Among the older injuries were abrasions or lacerations on the lips, cheeks, neck, back, arms, legs, labia and scalp. Some of the abrasions or lacerations had a looped pattern that could have resulted from a belt or electrical cord. The fresher injuries included abrasions on the nose, chin, ear, forehead and a bruised hand. Some of the facial abrasions followed a pattern as if a ligature had been used around the mouth. Dr. Kalekar's internal examination revealed a subgaleal hemorrhage in the left frontal area of the scalp and the brain was swollen. Judy's stomach and intestines were empty and the fecal matter in the intestines was hard, suggesting dehydration or lack of recent fluid intake. Dr. Kalelkar's opinion was that Judy Moses died from multiple blunt force injuries or, in other words, had been beaten to death. The mechanism of death was neurogenic cardiovascular shock, which means the pain, resulting from repeated beatings over a period of time, caused

her heart to fail. The shock could have taken several days to develop. No single injury could be singled out as the cause of death, but the injuries which were more than one month old were not a contributing factor.

Dr. Demetre Soder, defendant's expert, testified that in his opinion the technical cause of death was cerebral edema, described as diffuse swelling of the brain with herniation through the skull at the base of the brain. The injury could have resulted from trauma, such as repeated blows to the head over a period of time. A child could not have caused Judy's injuries.

Quiana Moses arrived at Silver Cross Hospital dirty, smelly and apparently without having eaten in some time. There were several open sores on her head, one of which being four inches in diameter and requiring skin grafting to close. Quiana also had wounds all over the rest of her body. There were burn-type wounds in the vaginal area, on one of her toes and her hand. Some of the wounds on her legs had a looped pattern as though inflicted with a belt or extension cord.

The evidence revealed defendant to be the primary caretaker of the Moses children. Defendant, in fact, admitted to spanking the girls with tree branches, a plastic bat, tying them to a bed, tying Judy's arms and legs together and putting her in the garage, and putting cotton balls in their mouths or ears to prevent them from crying when being switched.

The evidence also revealed that Frank Johnson suffered a stroke on January 11, 1985, and was hospitalized until early February. After returning home, he was required to take high blood pressure medicine and slept 14 hours per day. Frank twice observed defendant hit Quiana with switches, but not with such a force as to cause significant injury. Frank also testified to retrieving Judy from the garage the day defendant tied her up, placed her out there, and left for the day. Frank was not called by the prosecution as a witness. After defendant called Frank to testify, she attempted to impeach Frank regarding the disposition of the charges against him and the sentence he received. The trial court sustained the prosecution's objection to this line of questioning.

Defendant raises the following issues for review: First, (issue 1), whether the trial court erred in denying defendant's motion to discharge the jury panel; second (issue 2), whether the trial court erred in sustaining the prosecution's objection to defendant's attempt to reveal Frank's guilty plea and sentence to the jury; third issue (issue 3), whether the prosecution unfairly elicited prejudicial information and

raised improper insinuations before the jury; fourth (issue 4), whether the jury should have been instructed on involuntary manslaughter as a lesser included offense of murder and reckless conduct as a lesser included offense of aggravated battery; and fifth (issue 5), whether one of the two murder convictions must be vacated and the defendant receive a new sentencing hearing on the remaining conviction, and whether the extended-term sentence for aggravated battery was unauthorized. Any necessary facts not outlined above will be discussed more thoroughly with regard to each issue.

Defendant maintains that the procedures used by the Will County Jury Commission in selecting jurors violated statutory mandates and resulted in hundreds of prospective jurors being excused from service without proper grounds. Defendant does not, however, allege that members of any particular racial or ethnic group were excluded from service.

Will County relies upon a voter registration list, updated yearly, in preparing an active jury list. Each prospective juror selected randomly for the active jury list is then sent a questionnaire which is supposed to be returned within 10 days. Returned questionnaires are then reviewed by a jury commissioner for a determination of whether the person is approved for or excused from jury duty. If a prospective juror fails to respond, a second duplicate notice is mailed one month later. If a completed questionnaire is not returned, the prospective juror is considered rejected from service.

At the evidentiary hearing on the issue, defendant submitted into evidence four exhibits. Exhibit 1 was a computer printout dated June 8, 1988, and comprised names of prospective jurors for the active list. All 2,000 individuals listed in exhibit 1 were sent questionnaires, and the list was later used to mark by each individual's name whether that person was approved, excused, rejected, deceased or moved, depending on the responses received from the questionnaire. Some of the jurors summoned for defendant's trial are on this list. Exhibit 2 was a sample questionnaire. Group exhibit 3 were returned questionnaires of prospective jurors who were excused from service, primarily in late January and February of 1988 by the jury selection commission based solely on the questionnaire. Part A of exhibit 3 consisted of 213 questionnaires which the trial defense attorney and trial prosecutor agreed showed justifiable reasons for the commissioners to excuse the jurors. Part B comprised 23 questionnaires on which, the trial attorneys agreed, no good reason for reason for excusing the jurors appeared on the face of the respective questionnaire. Part C was 300 questionnaires which the State contended showed legitimate reasons

for excusing the prospective juror, but which defense counsel contested. Finally, exhibit 4 contained 41 questionnaires for the jurors comprising the venire from which the jury was drawn. Accompanying the questionnaires is a list of 75 names drawn for service; however, six of those jurors were permanently excused and 11 others were temporarily excused by either the jury commission or trial court.

Will County uses a jury commission for the jury process. As such, the commission has authority to submit questionnaires to prospective jurors, and upon prior approval of the chief judge of the judicial circuit, the commission

"shall excuse a prospective juror from jury service if the prospective juror shows that such service would impose an undue hardship on account of the nature of the prospective juror's occupation, business affairs, physical health, family situation, active duty in the Illinois National Guard or Illinois Naval Militia, or other personal affairs, and cause his or her name to be returned to the jury list or general jury list." (Ill. Rev. Stat. 1987, ch. 78, par. 10.2.)

Defendant has not argued that the commissioners in this case acted without authority of the chief judge of the circuit. Defendant maintains, however, that two substantial statutory violations occurred in the Will County procedure. First, defendant argues that no showing of undue hardship was made on a substantial number of questionnaires out of the 1,000 defendant reviewed, 23 of which the prosecution admitted showed no undue hardship. In this regard defendant asserts the commissioners acted arbitrarily in excusing jurors. As examples of her position, defendant cites situations where jurors were apparently excused because of their age, their care of young children, or their employers' failure to compensate them while serving jury duty. Defendant then alleges that certain jurors on the venire also had similar circumstances but were not excused by the commission. Second, defendant states that those who do not return a questionnaire are automatically excluded from service. Defendant maintains these individuals should remain on the active list subject to summons.

■ Defendant principally relies on *People v. Lembke* (1926), 320 Ill. 553, 151 N.E. 535. In *Lembke*, the court was faced with a situation where the county board failed to properly have available eligible jurors from which a jury could be selected. The statute at the time required the county board to make a list of not less than 10% of the legal voters of the county and then select no less than 100 qualified persons from said list for each jury trial term of the year for the purpose of creating a juror pool to draw from. (Ill. Rev. Stat. 1921, ch.

78, pars. 1, 2.) The county board, however, merely prepared a list representing 6% of the legal voters and then failed to hone the list by selecting 100 qualified jurors for each court term. Thus, the trial court apparently exhausted the list provided by the county board and was required to draft talesmen to serve as jurors. The court held that when significant provisions of the statute are not substantially complied with in the selection and qualification of a regular panel, then a defense motion to dismiss the panel should be allowed. There was absolutely no pretense by the county board, or even an attempt, to comply with the statute, and, therefore, the regular panel was illegal. (*Lembke*, 320 Ill. 553.) The court further stated that defendant need not make a specific showing of prejudice to be entitled to relief, because to sustain such a contention would be to absolutely disregard the mandates of law. All litigants are entitled to the same fair consideration by legally selected qualified jurors. *Lembke*, 320 Ill. 553.

In 1931, our State legislature enacted section 35 of the jury selection statute, which states as follows:

"No objection, exception or challenge to any petit juror or grand juror or to any panel [of] petit or grand jurors shall be allowed at any time because of any failure to comply with the provisions of this act or of the said rules, unless the party urging the same shall show to the court that actual and substantial injustice has resulted or will result to him, because of the error or defect charged." Ill. Rev. Stat. 1987, ch. 78, par. 35.

Defendant asserts that section 35 does not supersede the holding of *Lembke* stating that a defendant need not show actual prejudice before relief can be granted. We consider this a fair statement but, nonetheless, believe *Lembke* is not controlling. This is not a situation where the jury commissioners absolutely neglected to follow the required procedures for selecting a proper jury panel. At most, defendant can only argue that the jury commissioners were inconsistent in their determination of who should be excluded from the jury panel. It must also be kept in mind that much of what defendant maintains is nothing more than speculation or conjecture. Although we concur that it appears some of the prospective jurors were excused based on responses to questionnaires that failed to show undue hardship, we must keep in context the fact that the jury commissioners apparently review thousands of questionnaires. In this light, we consider it probable that any given defendant could cite examples of juror commission irregularities in practically any given case. We do not perceive in this case a total disregard of required procedure as was the situation in *Lembke*. As has been stated, "mere irregularities

in the selection which are not prejudicial are not a basis for reversal where there is substantial compliance with the law." (*People v. Beacham* (1980), 87 Ill. App. 3d 457, 468, 410 N.E.2d 87.) To hold otherwise would create a standard for county boards or jury commissions which would be extremely difficult to comply with in probably every instance. Defendant is not entitled to perfect compliance with the jury selection laws, just substantial compliance. The jury panel in this case was selected in substantial compliance with Illinois law.

Second (issue 2), defendant argues the trial court should have allowed her to elicit from her codefendant husband that he pleaded guilty to involuntary manslaughter and received a sentence of eight years. It is undisputed that both defendant and her husband, Frank, were originally charged with identical offenses and that both were found guilty after a jury trial, with said convictions being reversed on appeal for the failure of the trial court to sever their respective cases. Moreover, Frank subsequently pleaded guilty to involuntary manslaughter, agreed to testify against defendant if necessary, and received an eight-year prison sentence.

Frank was not called to testify by the prosecution, but instead was called by the defendant during her case in chief. Defendant maintains that evidence of Frank's negotiated plea was either admissible as substantive evidence to support the theory of her defense or admissible in order to impeach Frank's credibility as a prior inconsistent statement, a prior conviction, or as a means of showing Frank's interest, bias or motive to testify falsely.

We are not persuaded that defendant is entitled to elicit Frank's plea and sentence as substantive evidence in her defense. No evidence indicates that this is a case where only one person could have committed these crimes. In fact, the evidence indicates that defendant, not Frank, is responsible for these acts. Nonetheless, an accomplice's guilt or innocence is irrelevant to defendant's guilt. (*People v. Williams* (1983), 115 Ill. App. 3d 276, 450 N.E.2d 851.) The real question is whether this evidence was admissible to impeach Frank's credibility as a witness. On this point we note that Supreme Court Rule 238, which applies to criminal cases under Rule 433, states that "[t]he credibility of a witness may be attacked by any party, including the party calling him." (107 Ill. 2d Rules 238(a), 433. See also *People v. Bolden* (1987), 152 Ill. App. 3d 631, 504 N.E.2d 835.) Impeachment of a codefendant's credibility may be done by showing that the codefendant has pleaded guilty or has been convicted of the same offense. (*People v. Sullivan* (1978), 72 Ill. 2d 36, 377 N.E.2d 17; *People v. Burch* (1974), 22 Ill. App. 3d 950, 317

N.E.2d 136.) A codefendant can likewise be impeached by evidence of the codefendants' sentence for purposes of showing any interest, bias or motive to testify falsely and wide latitude must be accorded an examiner in doing same. (*Davis v. Alaska* (1974), 415 U.S. 308, 39 L. Ed. 2d 347, 94 S. Ct. 1105; *People v. Triplett* (1985), 108 Ill. 2d 463, 485 N.E.2d 9; *People v. Rogers* (1976), 42 Ill. App. 3d 499, 356 N.E.2d 413; *People v. Foley* (1982), 109 Ill. App. 3d 1010, 441 N.E.2d 655.) Classically, a codefendant is impeached where his testimony has inculpated the defendant on trial. Here, however, the State did not call Frank as a witness and, therefore, no situation was presented where a codefendant was called as a witness by the State to "point the finger" at the defendant on trial. Instead, defendant called Frank to testify and attempted to get Frank to state that he was responsible for the death of Judy and the injuries to Quiana. In this regard, Frank testified that he did not know who was responsible for the crimes committed. Although, he did state that he did not commit the acts. Frank said nothing more than witnessing defendant strike the girls on two occasions and discovering Judy tied to a chair in the garage; things which defendant admitted doing. Thus, we cannot say that Frank's credibility was called into question such that he was subject to impeachment regarding his plea and sentence to the charges against him.

Defendant next asserts (issue 3) that the prosecutor unfairly elicited prejudicial material from witnesses regarding defendant's moral character. The sum and substance of these allegations are the State elicited that defendant smoked marijuana the day of Judy's death; that Richard Eames was her boyfriend; that there was inquiry regarding defendant's relationship with the girl's father; and that there was questioning regarding defendant's termination from a day care center. Without going into specific detail as to each specific allegation of error, we find that defendant has waived these issues on appeal by failing to include said objection in her post-trial motion for a new trial. (See *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.) For most of these allegations, defendant further failed to object during the course of the trial. Nor do we believe these allegations should be considered under the plain error doctrine, as that doctrine is reserved for situations where fundamental fairness necessitates appellate review of an alleged error regardless of whether the issue was properly preserved for review. Although some of the allegations may have potentially had merit if properly preserved for review, we do not believe that defendant was denied a fair trial as a result.

Issue 4 regards the trial court's refusal to give an involuntary

manslaughter instruction to the jury. We note initially that defendant is entitled to instructions on her theory of the case. (*People v. Lefler* (1967), 38 Ill. 2d 216, 230 N.E.2d 827.) Undeniably, an involuntary manslaughter instruction is appropriate where evidence in the record, if believed by the jury, would reduce the degree of the offense charged. (*People v. Foster* (1987), 119 Ill. 2d 69, 518 N.E.2d 82.) Similarly, however, if no evidence was presented which could reduce defendant's murder charge to involuntary manslaughter, then an instruction should not have been given. Basically, there must be evidence in the record which would cause a jury to believe that the defendant acted recklessly instead of knowingly in causing the death of Judy Moses.

■■ "Recklessness" is defined in section 4—6 of the Illinois Criminal Code of 1961 as follows:

"A person is reckless or acts recklessly when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." Ill. Rev. Stat. 1987, ch. 38, par. 4—6.

■■ Defendant principally argues that she was entitled to an involuntary manslaughter instruction because: the death of Judy Moses cannot be attributed to one specific injury; Frank was also responsible for Judy's care at times; defendant admitted to striking Judy with various objects at various times; and defendant expressly denied intending to beat Judy to death. We find none of these arguments persuasive. The evidence in this case reveals that Judy Moses suffered injuries to practically every part of her body after coming into the care of defendant. Although one specific injury cannot be attributed to Judy's death, both experts basically agreed that Judy Moses was literally beaten to death. It is therefore insignificant to this court whether Judy died as a result of one particular injury or a cumulation of many injuries, because the end result was the same. Considering the number and degree of injuries discovered at the autopsy, it is patently inconceivable that these injuries could possibly be the result of reckless conduct. In fact, it would be more believable that defendant acted recklessly if Judy had died from one single injury. The bottom line is that Judy Moses was tortured the last month of her life, and the jury concluded that defendant was responsible. No evidence. of reckless conduct can be found in the record. This opinion further finds support in *People v. Ward* (1984), 101 Ill. 2d 443, 463 N.E.2d 696. In *Ward*,

the victim, a young child, was beaten with a mop stick on two occasions by his mother's boyfriend. The injuries to the victim were too numerous to count and covered much of his body. A pathologist testified that the young child died from respiratory arrest due to cerebral edema. The boyfriend maintained that he did not touch the child the day the injuries were inflicted, but a jury thought otherwise and convicted him of murder. The appellate court reversed the conviction on the basis that an involuntary manslaughter instruction should have been given to the jury. The supreme court reversed the appellate court and held that the trial court correctly refused to give an involuntary manslaughter instruction. Basically, the court stated that since the boyfriend maintained he did not touch the child, he presented no evidence whatsoever of reckless conduct. Secondly, even if it were assumed that the boyfriend stated he did not intend to kill the child, the court considered the severity of the beatings inflicted negated any suggestion of recklessness. We find *Ward* controlling and believe the trial court properly refused to give defendant's tendered instruction.

■■ Defendant also states the trial court should have given a reckless conduct instruction as a lesser included offense of aggravated battery for the charge relating to Quiana Moses. We disagree. First, no reckless conduct instruction was tendered to the court for consideration, and therefore, the issue has been waived. Secondly, no plain error was committed for the same reason that the involuntarily manslaughter instruction was properly refused. Quiana also suffered injuries to most of her body, including large open wounds on her head, one of which required skin grafting to close. The number and severity of these injuries negate any suggestion of recklessness. It is simply fortunate that Quiana did not suffer the same fate as Judy.

■■ Finally, defendant argues (issue 5) that defendant cannot be convicted and sentenced on two separate murder charges where there is only one underlying murder. Defendant therefore maintains that one of the convictions should be reversed and a new sentencing hearing should be had as to the remaining conviction. We agree that one conviction should be reversed but disagree that a new sentencing hearing is required as a result.

■■ Defendant was convicted of murder and felony murder based on aggravated battery. Two convictions for one underlying murder cannot stand, and one of the convictions must be vacated. (*People v. Payne* (1983), 98 Ill. 2d 45, 456 N.E.2d 44.) In this regard, defendant maintains that a new sentencing hearing is necessary because the trial court may well have considered the vacated conviction in passing sentence upon the remaining conviction. Defendant was sentenced to a 60-

year term of imprisonment for each murder conviction. A case need not be remanded for resentencing, however, where there is no indication that the trial court considered or was influenced by the vacated conviction in passing sentence. (*People v. Sanford* (1983), 119 Ill. App. 3d 160, 456 N.E.2d 333.) Defendant makes no citation to the record as support for her theory that the court was influenced by the presence of two murder convictions.

■■■ Secondly, defendant argues the trial court failed to properly take into consideration her rehabilitation and that she must be considered a "model prisoner." The trial court, however, found that defendant's conduct was exceptionally brutal or heinous behavior indicative of wanton cruelty and further found the acts to have been committed against a person under 12 years of age. Under section 5—8—1 of the Unified Code of Corrections, a person convicted of first degree murder shall be sentenced to a term of "not less than 20 years and not more than 60 years," unless aggravating circumstances warrant an extended term or natural life imprisonment. (Ill. Rev. Stat. 1987, ch. 38, pars. 1005—8—1(a), 1005—8—2.) In light of the court's finding that certain aggravating factors existed warranting the imposition of either one of the two more severe sentencing options, the trial court sentenced defendant to 60 years. This was clearly within the trial court's discretion.

■■■ Regarding defendant's aggravated battery conviction, the trial court imposed an extended-term sentence of 10 years. Section 5—8—2 of the Unified Code of Corrections states that an extended term may be imposed when the trial court makes specific findings that one or more of the factors listed under paragraph (b) of section 5—5—3.2 are present. (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—2.) Under section 5—5—3.2, two of the factors which the court found to exist were that the act was exceptionally brutal or heinous behavior indicative of wanton cruelty and the felony was against a person under 12 years of age. (Ill. Rev. Stat. 1987, ch. 38, par. 1005—5—3.2(b).) We do not quarrel with either of these express findings and, therefore, the trial court acted within its bounds of discretion.

For all of the foregoing reasons, the decision of the trial court is affirmed with the limited exception that the case be remanded with instructions that one of the two murder convictions and its sentence be vacated.

Affirmed in part; reversed and remanded in part.

STOUDER and BARRY, JJ., concur.