THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KIRK WILLIAMS, Defendant-Appellant.

First District (3rd Division)    No. 1—89—0364

Opinion filed July 19, 1995.—Rehearing denied August 24, 1995.

Rita Fry, Public Defender, of Chicago (Beth I. Solomon and Bruce Landrum, Assistant Public Defenders, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee G. Goldfarb, James E. Fitzgerald, and Michelle Katz, Assistant State's Attorneys, of counsel), for the People.

JUSTICE RIZZI delivered the opinion of the court:

Defendant Kirk Williams was convicted of murder and aggravated battery to a child, in a jury trial. After the jury found defendant eligible for the death penalty, it was unable to reach a unanimous verdict as to whether the death penalty should be imposed. Defendant was then sentenced to life imprisonment on the murder conviction and a concurrent term of 14 years' imprisonment on the aggravated battery conviction. We affirm.

Tansie and Andrew Williams were married for about three years before they separated. Andrew Williams is not related to defendant Kirk Williams. Before they separated, Tansie and Andrew Williams had two children, Lynesshia and Gloria. After they separated, Tansie had another child, Jessica. Apparently, Andrew Williams believed that he was Jessica's father, and defendant believed that defendant was Jessica's father.

After Jessica was born, in June of 1986 Tansie and the three children moved into an apartment with defendant. While living in the apartment, defendant would beat Tansie "mostly every night," and he would beat Lynesshia and Gloria "twice out of a month."

On May 21, 1987, Lynesshia was four years old and Gloria was three years old. On that day, Tansie left the apartment with Jessica in the early morning. Lynesshia and Gloria were left alone in the apartment from early morning until about 6 p.m., when Tansie returned along with Jessica and defendant. There had been no food except a peanut butter sandwich in the apartment.

Defendant went to put a six-pack of beer that he had purchased into the refrigerator. In the refrigerator, defendant saw an apple core. Defendant asked Tansie whether she had given the kids anything to eat, and when she replied that she had not, defendant said that he was going to the bedroom to ask Lynesshia and Gloria if they went in the refrigerator.

Lynesshia and Gloria denied going into the refrigerator and "blamed" each other. Defendant then said that he was going to whip both of them. He got two belts and beat the two children with the belts and his fists. He also beat their heads against the floor.

When Tansie heard the children crying, she went to the bedroom and saw Gloria face down on the floor with defendant on top of her; his knee was in her back. Defendant then grabbed Tansie and took her into another bedroom and tied her up with an extension cord.

Defendant returned to the other bedroom and beat the children again with the belts and his fists. After beating the children for about an hour, defendant went to the other bedroom and watched television.

Lynesshia cried for about 20 minutes. Defendant went back into the bedroom where she was crying and beat her again for about 20 minutes. After silencing her, defendant returned to his bedroom and went to sleep. The next morning, at about 4 a.m., defendant awoke and untied Tansie. She went to the other bedroom to see the children. In the bedroom, she saw Lynesshia lying behind the door in a pool of blood and vomit. Lynesshia was dead. Gloria was sleeping in the closet.

Although Lynesshia was dead, Tansie cleaned and dressed her and placed her on the couch. Tansie also washed and cleaned Gloria. In addition, Tansie washed and cleaned the blood and vomit in the bedroom. Tansie then went to a neighbor and telephoned the police, telling the operator that she thought her daughter was dead. Tansie then returned to her apartment and told defendant that she would have him arrested when the police arrived. Defendant urged her to tell the police that Lynesshia had fallen down the stairs, and Tansie agreed to do so.

The police arrived at the apartment at about 6 p.m. Tansie told the police that Lynesshia had fallen down the stairs. The next day, at about 7 a.m., defendant and Tansie were taken to the police station. Later, after she learned of the incident and saw that Gloria was bruised, beaten and feverish, Tansie's mother, Marjorie Williams, took Gloria to Bethany Hospital. They arrived at the hospital at about 8 a.m.

At about 8:30 a.m., Gloria was examined by a doctor in the emergency room. He observed multiple bruises to the body and blood in her urine. Also, he noted that Gloria would cry from pain if any part of her body was touched.

About 12 hours after the beatings had taken place, Gloria awoke while she was lying on a gurney in the emergency room of the hospital. Her grandmother, Marjorie Williams, an aunt, a cousin, and David Volkman, an investigator with the Department of Children and Family Services, were present. Upon awakening, Gloria looked at her grandmother and said: "Kirk is going to kill me, I want my daddy, Kirk is going to kill me, I want my daddy."

Detective John McKenna worked on the investigation of the case. After hearing that Tansie changed her story and accused defendant of beating the children, McKenna obtained a search warrant for defendant's apartment. McKenna then went to the police station where he met with defendant in an interview room at about 2 p.m.

McKenna read defendant his *Miranda* rights and placed him under arrest. McKenna then conversed with defendant for about a half-hour. McKenna told defendant that Tansie said he had beaten the girls and that Gloria made a statement that he had beaten them.

McKenna then executed the search warrant by entering defendant's apartment with a key that had been given to him by defendant or Tansie. At the apartment, McKenna discovered and obtained two leather belts that appeared to have been used in the beatings. Afterward, McKenna returned to the police station, and at about 5 p.m., he called for an assistant State's Attorney. Shortly after 7 p.m., McKenna and the assistant State's Attorney, Jack Bailey, went to speak to defendant, who was still at the police station. While they were there, McKenna and Bailey had a conversation with defendant.

McKenna told defendant that (1) Tansie said that defendant beat the girls, (2) Gloria made a statement that defendant beat her and Lynesshia, and (3) that the medical evidence showed that the injuries to Lynesshia were not consistent with falling down stairs. Immediately thereafter, defendant confessed and gave his statement as to what occurred. Defendant's statement was reduced to writing by Bailey and signed by defendant at 9:15 p.m., more than 12 hours after defendant had arrived at the police station.

Defendant's signed statement relates that he arrived at the apartment at 8 p.m. and noticed that Lynesshia and Gloria had messed up the refrigerator and partially turned on the stove. He took the two girls into their bedroom and told them they would get a whipping. Defendant then struck Gloria with a leather belt for three to four minutes. Then defendant struck Lynesshia three or four times on the chest with his open hand, and five or six times with a belt on the back and once on the face when she ducked. Defendant then went to bed and woke at 4:15 a.m., and noticed that Lynesshia was dead. Defendant woke Tansie, and together they made up a story that Lynesshia had fallen down the stairs. Defendant's statement finally provides that he and Tansie made up the story because they were nervous.

On appeal, defendant first contends that "the trial court erred in admitting hearsay evidence regarding Gloria Williams' statement to Mr. Volkman of DCFS where the requirements for a spontaneous declaration were not satisfied." Volkman testified to what Gloria said to her grandmother in the emergency room of the hospital. The gist of defendant's argument is that Gloria's statement in the emergency room was not admissible because it "was made nearly 12 hours after the beatings occurred and after she came into contact with numerous people, two of whom were witnesses testifying for the prosecution." Defendant's argument is untenable.

The requirements for admissibility of a statement as a spontaneous declaration are threefold. First, there must be an event sufficiently startling to produce a spontaneous and unreflecting statement. Second, there must be an absence of time to fabricate. Third, the statement must relate to the circumstances of the occurrence. (*People v. House* (1990), 141 Ill. 2d 323, 381, 566 N.E.2d 259, 285.) A consideration of these three factors must demonstrate that the statement is truthful rather than fabricated. The three factors, however, must not be considered in discrete vacuums. Rather, they must be considered together within the totality of the circumstances.

■ Here, the totality of the circumstances plainly demonstrates that the three factors for a spontaneous declaration were met and that Gloria's statement was truthful rather than fabricated. Gloria was four years old at the time, and her statement related to a senseless beating that she had suffered merely 12 hours earlier. Common sense and everyday life experience leave no room for doubt that the stress and fear of such emotional trauma to a child of Gloria's age will plainly endure for more than 12 hours. In addition, the fact that a child of her age may have had contact with numerous people during the 12-hour interval does not detract from the spontaneity of the outburst to her grandmother upon awakening while lying on a gurney in the emergency room of a hospital. Moreover, defendant does not even allege that any specific conversation that Gloria may have had with anyone influenced the spontaneity of her declaration when she saw her grandmother. Thus, there is no merit to defendant's contention that the statement was not admissible as a spontaneous declaration.

Next, defendant contends that "the trial court erred in permitting Detective McKenna to testify regarding the hearsay statement attributed to Gloria Williams implicating Kirk Williams in the beatings." Specifically, defendant refers to the following testimony by McKenna:

"Q. Did you also learn whether or not Gloria Williams, the 3 year old girl who was taken to the hospital whether or not she had said anything with regard to the beating?

A. Yes, I did.

Q. What did you learn that she had said?

A. I had learned that she told me that she had been beaten.

DEFENSE COUNSEL: Objection.

THE COURT: Ask your question again.

PROSECUTOR: Did you learn whether or not Gloria Williams made a statement with regard to the beating?

THE WITNESS: Yes, I did."

We disagree with defendant's contention that error was committed by the admission of the above testimony into evidence. A police officer may recount the steps taken in the investigation of a crime, and may describe the events leading up to the defendant's arrest, where such testimony is necessary to fully explain the State's case to the jury. In addition, a police officer may testify about his conversations with others, such as victims or witnesses, when such testimony is not offered to prove the truth of the matter asserted by the other person, but is used to show the investigative steps taken by the officer. Moreover, testimony describing the progress of the investigation is admissible even if it suggests that a nontestifying witness implicated the defendant. *People v. Simms* (1991), 143 Ill. 2d 154, 174, 572 N.E.2d 947, 954-55; *People v. Leverston* (1985), 132 Ill. App. 3d 16, 33, 476 N.E.2d 1344, 1356-57.

■ In the present case, McKenna testified that he went to the emergency room and made observations about Gloria's condition. He testified that while there, he learned that Lynesshia's injuries had been inflicted by the defendant when he beat her with a belt and his hands. Thus, McKenna's testimony about Gloria telling him "that she had been beaten" plainly showed that the injuries to the children did not occur as a result of falling down stairs as had been claimed by Tansie and as she was told to say by the defendant. It follows that the purpose of McKenna's testimony about Gloria's statement was not to show the truth of the statement but, rather, to show why McKenna's investigation continued in the manner in which it did despite Tansie and defendant's version of what occurred. There was therefore no error in allowing the testimony of McKenna. *Simms*, 143 Ill. 2d at 174, 572 N.E.2d at 954-55; *Leverston*, 132 Ill. App. 3d at 33, 476 N.E.2d at 1356-57.

Although there was no error in allowing the testimony of McKenna which we have discussed, defendant contends that "this initial error was exacerbated later during the continuation of McKenna's direct testimony." Defendant makes reference to the following testimony of McKenna:

"PROSECUTOR: Detective McKenna, did you learn that Gloria had made a statement that Kirk Williams had beat both her and her sister, Lynesshia Williams?

THE WITNESS: Yes, I did.

Q. Did you also learn, detective, that the injuries that Lynesshia Williams had sustained were not consistent with falling on the stairs?

A. Yes, I did.

Q. When you went to talk to Kirk Williams at 2 o'clock in the

afternoon and after you introduced yourself and advised him of his rights per Miranda, did you confront Kirk Williams with Tansie's statement which you had learned Gloria had said and with what you had said about Lynesshia's injuries?

A. Yes.

Q. After you confronted him with these 3 things, what did Kirk Williams do or say?

A. He told me that he came home and observed that something was messed up in the refrigerator and told them that they had to take a whipping for this. One girl volunteered to be first. He went in and hit her with the belt a few times. Then Lynesshia, he hit her with the belt a few times too.

Q. Did he tell you what he did when he found out that Lynesshia was dead the next morning?

A. (No audible response.)

Q. Did he tell you why he had told—

DEFENSE COUNSEL: Objection. Judge, was there an answer to that question?

COURT REPORTER: I didn't hear one.

PROSECUTOR: I'll ask another question.

Q. Did Kirk Williams tell you why he had made up a story earlier?

DEFENSE COUNSEL: Objection as to first of all, as to the time of the conversation that we're talking about, Judge.

PROSECUTOR: Judge, I'll withdraw the question.

THE COURT: Okay."

Defendant claims that it was error to allow McKenna to testify about Gloria's statement that defendant beat her and her sister because it was a hearsay statement. The State counters that it was its theory that defendant initially told Tansie to tell the police that Lynesshia had fallen down the stairs and that he changed his story and confessed to beating the children only after being confronted with the fact of Gloria's statement. The State argues that McKenna's testimony about Gloria's statement therefore goes to the issue of whether defendant's signed confession was voluntary or coerced, which was an issue raised by defendant at trial. We agree with the State.

Prior to trial, defendant made a motion to suppress his statements, including the signed confession, on the basis that the statements were involuntary and coerced. The motion was denied. While McKenna testified at trial, however, defendant conveyed to the jury that his signed confession was involuntary and coerced because it was the product of long hours in the police station, prevention from use of toilet facilities, and lack of food and water. Defendant was in the police station 12 hours before he gave his signed confession.

■ Under the circumstances, it is plain that the admission of McKenna's testimony about Gloria's statement was not to prove the truth of the statement but, rather, to show that defendant's signed confession was given only after he was confronted with the fact of Gloria's statement. This goes to the issue of whether his signed confession was voluntary or coerced. There was therefore no error in the admission of McKenna's testimony. See *People v. Jackson* (1990), 198 Ill. App. 3d 831, 845, 556 N.E.2d 619, 628-29.

Defendant's next point relates to the testimony of Andrew Williams. During a motion *in limine*, the trial court noted that it was defendant's theory that Tansie, rather than defendant, was responsible for the crimes in the case and that defendant planned to use proceedings that occurred at juvenile court to buttress that theory.

At trial, Andrew Williams testified on direct examination that he was at juvenile court in May of 1987, a week before Lynesshia was killed and Gloria was battered. Andrew Williams testified that he was at the juvenile court as a result of complaints that he had filed with the DCFS that the children were being abused while living with Tansie and defendant. After the juvenile court courtroom proceedings, Andrew Williams and defendant got into a fight outside the courthouse. During the fight defendant took off his long leather belt with a buckle and swung and hit Andrew Williams with it. The belt was identified as one of the two belts that defendant used to beat the children a week later.

On cross-examination, Andrew Williams testified that the fight between him and defendant occurred because of the child abuse complaints he had filed with the DCFS. During redirect examination, the prosecutor asked Andrew Williams if any words were spoken during the fight. Andrew Williams testified that defendant told him "if he didn't get me he was going to get somebody, he told me I was going to get mine, if he couldn't get to me he was going to get somebody."

Defendant contends that it was error to admit his statement to Andrew Williams in evidence because it was admitted "solely to show his propensity for violence," and the "threat was vague and highly prejudicial." We disagree with defendant's contention.

Evidence of other crimes, threats or wrongful conduct is not admissible to show the defendant's character or propensity to commit crime or wrongful acts. Such evidence is admissible, however, if it is relevant for any other purpose. Thus, such evidence is admissible if it is relevant to show the defendant's state of mind, motive or the presence of criminal intent. *People v. Kimbrough* (1985), 138 Ill. App. 3d 481, 484-85, 485 N.E.2d 1292, 1296.

■ In the present case, it was defendant's theory that Tansie, rather than defendant, was responsible for the crimes. As a result, defendant's threat was relevant to show his state of mind, motive and presence of criminal intent to commit the crimes in contradiction to Tansie's being responsible for the crimes. Although relevant, however, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Under all the circumstances in the instant case, we conclude that the probative value of the evidence of defendant's threat was not substantially outweighed by prejudicial unfairness. We also conclude that the admissibility of the evidence was within the sound discretion of the trial court.

Defendant next claims that "the trial court erred in admitting into evidence a map that was supposedly drawn by Kirk Williams where the necessary evidentiary foundation was not laid as there was no showing that the map was connected to Kirk Williams." The record demonstrates, however, that defendant's claim is untenable.

The map depicts the layout of the apartment where the crimes were committed. It shows each of the rooms, and it has six "stick" figures at various locations. One room has three of the stick figures enclosed in a boxed-off area with a notation: "alive 8 to 10:15 sitting up talking." The stick figures have letters under them, respectively, L, J and G. Just outside the boxed area is another stick figure, which appears to be lying on an object. An arrow points to the figure with the notation: "4:30 a.m. 5/27/87." Another stick figure is located in a closet outside of the room where the three boxed-off figures are located. There is one more stick figure located near what is marked "closet" in another room. Inside this latter room, "bed" is marked and "TV" is marked.

■ Tansie testified that the map depicted the apartment where the crimes occurred, and that the map accurately reflected the layout of the apartment and how it looked the day of the crimes. She also testified that the stick figures were, respectively, in the kids' room, the room behind the door, the hall closet, and her room behind the door. Tansie then testified that the map was mailed to her in a letter from defendant. In addition, she testified that she knew defendant's handwriting and that the handwriting on the map was the defendant's handwriting. Under the circumstances, it is eminently clear that there was sufficient foundation at trial as to authentication and identification of defendant's handwriting on the map. (See Fed. Rules Evid. 901(b)(1) through (b)(4).) It is equally clear that the trial court's ruling that there was sufficient foundation for admitting the map into evidence was proper. (See *People v. Munoz* (1979), 70 Ill. App. 3d

76, 84, 388 N.E.2d 133, 141-42.) No error was committed regarding the map.

Defendant next claims that "it was reversible error to permit Tansie Williams to testify to prior consistent statements during her redirect examination which bolstered her testimony and credibility." There is no merit to defendant's claim.

During cross-examination of Tansie, defendant attacked her credibility. Defendant brought out for the first time that Tansie had a conversation with a counselor at the Bobby Wright Mental Health Center about six months after the crimes were committed. The conversation was used to impeach Tansie's testimony on direct examination. For example, Tansie was impeached when defendant established that she told the counselor that defendant beat the children with cords and sticks, which she later admitted to be untrue. She also admitted that her claim that defendant put a bucket on her head when he tied her up was untrue.

On redirect examination the following occurred:

"Q. Now when you went in and you talked to the counselor you told the counselor that Kirk Williams did tie you up, is that correct?

A. Yes.

Q. And you also told the counselor that after he tied you up and he went back and beat the children, isn't that also correct?

A. Yes.

Q. You also told the counselor that during that time your children were calling out for their mother, isn't that also correct?

A. Yes.

Q. You told the counselor at that time that Kirk Williams beat your children for an hour, is that correct?

A. Yes.

Q. You told the counselor that you found Gloria in the closet, is that also correct?

A. Yes, it is.

Q. And you also told them that you found Lynesshia behind the bedroom door, is that correct?

A. Yes, it is.

Q. And you told the counselor that after you cleaned up Lynesshia you called the police, is that correct?

A. Yes."

■ As a general rule, a witness may not be rehabilitated by the admission of former statements which are consistent with the witnesses' trial testimony. It is well established, however, that where a witness is impeached by prior inconsistent statements that took place in a conversation, the opponent to the impeachment may bring out

all of the prior conversation to qualify or explain the inconsistency and rehabilitate the witness. (*People v. Harris* (1988), 123 Ill. 2d 113, 139, 526 N.E.2d 335, 347.) In the present case, the testimony elicited by the prosecution on redirect examination of Tansie is testimony which qualified her prior inconsistent statements and served to rehabilitate her as a witness. Thus, no error was committed by the redirect examination.

Defendant also contends that "the State improperly introduced evidence of other crimes which were not material to any issue at trial for the sole purpose of demonstrating Kirk Williams propensity for violence." Defendant's contention relates to the testimony of Andrew Williams and Marjorie Williams.

Andrew Williams testified that when defendant was living with Tansie, many of his attempts to see his children were futile. On some occasions defendant would tell him that the children were not home. On other occasions Andrew Williams and defendant would get into fights when Andrew Williams attempted to see the children. In response to questions on both direct and cross-examination, Andrew Williams recounted an incident that occurred about a month before the crimes in the present case. He went to pick up the children and a fight ensued between him and defendant. Marjorie Williams was present. Defendant went after Andrew Williams with a knife, and in an attempt to stab him, defendant cut Marjorie Williams on the hand when she got in the way.

Marjorie Williams also testified about the incident. She testified that after defendant told them that "we wasn't going to see her (*i.e.*, Tansie) or the damn children anymore," he "grabbed a two by four and came out swinging." She testified that defendant then attempted to stab Andrew Williams, but ended up cutting her instead.

■ Defendant argues that the testimony of Andrew Williams and Marjorie Williams relating to the fight incident was evidence of other crimes and should not have been admitted in evidence. This evidence, however, shows that shortly before the crimes in the present case were committed, defendant expressed his intent, verbally and by the use of a deadly weapon, to keep Andrew Williams and Marjorie Williams away from Tansie and the children. It also shows that defendant had a motive to commit the crimes in the present case. It follows that the evidence was properly admissible to show intent and motive. (See *People v. Nichols* (1992), 235 Ill. App. 3d 499, 506, 601 N.E.2d 1217, 1223; *People v. Durso* (1968), 40 Ill. 2d 242, 250, 239 N.E.2d 842, 846-47.) No error was committed by the admission of the evidence referred to by defendant.

Defendant also argues that "the trial court erred in refusing to

instruct the jury on the offense of involuntary manslaughter where Kirk Williams' statement suggested that he acted recklessly." Defendant relies on his statement that was given to the police in which he said that "he struck Lynesshia in the chest with his open hand three or four times and that he struck her in the back five or six times with a belt and once on the face." Defendant argues that because of what he said in his statement to the police, the jury should have been instructed on involuntary manslaughter. We disagree.

■ An involuntary manslaughter instruction should not be given where there is no evidence which would cause a jury to believe that the defendant acted recklessly rather than knowingly in causing the victim's death. (*People v. Johnson* (1990), 197 Ill. App. 3d 74, 85, 554 N.E.2d 696, 702; *People v. Ward* (1984), 101 Ill. 2d 443, 451, 463 N.E.2d 696, 699.) Although a defendant may have made a statement that he did not intend to kill the victim, the severity of the beating coupled with the fact that the victim was a mere child may totally negate any reasonable inference that the defendant acted recklessly rather than knowingly in causing the victim's death. Here, the facts belie any reasonable inference that would elevate to a factual issue defendant's claim that he merely acted recklessly. The trial court, therefore, did not err in refusing to give the jury an involuntary manslaughter instruction.

■ Defendant's penultimate contention is that "the numerous instances of improper remarks made during the course of the prosecutor's closing and rebuttal arguments denied Kirk Williams a fair trial." Defendant initially alleges that the prosecutor argued to the jury that defendant beat Lynesshia and Gloria because they were not his children. The record sufficiently raises a reasonable inference, however, that defendant believed Jessica was his biological child and that she was not harmed because he felt differently toward her than the two children that were beaten.

Defendant also refers to that part of the prosecutor's closing argument where it was suggested that only Andrew Williams and Marjorie Williams really cared for Lynesshia and Gloria. The evidence, however, supports this conclusion, also. A prosecutor may present his theory of the case to the jury so long as the theory is based upon evidence and reasonable inferences which can be drawn therefrom. *People v. Cisewski* (1987), 118 Ill. 2d 163, 175-76, 514 N.E.2d 970, 976-77.

Additionally, defendant claims that the prosecutor shifted the burden of proof in his rebuttal argument by making reference that there was no evidence that Tansie committed the crimes although defendant "planted the seed in your mind" that Tansie was the one

who committed the crimes. More specifically, the prosecutor stated: "Have you heard any evidence in this case that she did it? Maybe she is not telling the complete truth about what happened, but I didn't hear any evidence that she did it."

■ Defendant's theory throughout the case was that Tansie rather than he committed the crimes. There was no direct evidence, however, that Tansie committed the crimes. Where the defense presents a theory which is unsupported by direct evidence, the prosecutor is not precluded from commenting on that lack of evidence. It follows that no error was committed by the prosecutor's comments.

■ Finally, defendant contends that "the imposition of a natural life sentence in this case was a clear abuse of discretion where the trial judge failed to consider any evidence presented in mitigation, focused on unreliable evidence and Kirk Williams' actions were clearly not premeditated." The plain fact, however, is that the trial judge did not fail to consider evidence presented in mitigation and did not focus on unreliable evidence. In addition, the record amply establishes that defendant's actions were premeditated.

Moreover, there was no abuse of discretion by the trial judge in any aspect of this case. Indeed, the entire record demonstrates that the trial judge's handling of this case is commendable. The record reflects that he is a learned trial judge who was fair, patient and caring throughout the trial.

Accordingly, the judgment is affirmed.

Affirmed.

TULLY and CERDA, JJ., concur.